The **MANOR AT ST. LUKE VILLAGE, Carbondale Nursing Home, Inc., and Taylor Nursing and Rehab Center,** Petitioners

v.

**DEPARTMENT OF PUBLIC WELFARE,** Respondent.

Commonwealth Court of Pennsylvania.

Argued June 17, 2013.

Decided July 10, 2013.

Reargument Denied Aug. 29, 2013.

Daniel K. Natirboff, Harrisburg, for petitioners.

Edward G. Cherry, Senior Counsel, Harrisburg, for respondent.

BEFORE: SIMPSON, Judge, BROBSON, Judge, and McCULLOUGH, Judge.

OPINION BY Judge BROBSON.

By Order dated November 27, 2012, we granted the petition for permission to appeal of Petitioners The Manor at St. Luke Village, Carbondale Nursing Home, Inc., and Taylor Nursing and Rehab Center (collectively referred to as Providers). Providers asked us to review an interlocutory decision of the Department of Public Welfare (DPW), Bureau of Hearings and Appeals (Bureau). In granting that request, we agreed to consider the following question:

> Whether a provider that participates in the Pennsylvania Medical Assistance Program can dispute audit adjustments used to calculate its payment rates which were not previously appealed through an appeal of the subsequently issued rate notice?

(11/27/2012 Order.) The Bureau ruled that a Medical Assistance (MA) provider that fails to avail itself of the opportunity to appeal audit results pursuant to 55 Pa. Code § 1187.141 [1] waives any right to challenge those audit results at a later time. For the reasons set forth below, we affirm.

---

1. This DPW regulation provides, in relevant part:

   (a) A nursing facility has a *right to appeal and have a hearing* if the nursing facility does not agree with the Department's decision regarding:

   . . .

   (2) *The findings issued by the Department in a desk or field audit of the nursing facility's MA–11 cost report.*

   . . .

   (b) A nursing facility appeal is subject to § 1101.84 (relating to provider right of appeal).

   (c) A nursing facility's appeal shall be filed within the following time limits:

The Providers are nursing facilities that provide care and services to Medicaid beneficiaries under the Commonwealth's MA Program. MA providers are paid for the MA services that they provide on the basis of an annual prospective payment rate, which is set by DPW and referred to as a "Case–Mix Rate." DPW has promulgated regulations setting forth the process by which it determines Case–Mix Rates. *See* 55 Pa.Code Ch. 1187, subchapter G. Under the applicable regulations, the development of Case–Mix Rates generally involves a three-step process.[2]

The first step of the process requires MA nursing facility providers to submit "cost reports" on an annual basis, which the regulations refer to as "MA–11 cost reports." *Id.* §§ 1187.22(12) (requirement to file cost report), 1187.71 (identifying specific costs to be included in cost report by category), 1187.73 (identifying term of fiscal year and time within which provider must submit its cost report). A provider's cost report essentially sets forth fiscal-year costs separated into three categories: (1) resident care costs, (2) other resident related costs, and (3) administrative costs. When DPW receives a provider's cost report, it conducts an audit of the cost report, and DPW may adjust the items in a cost report by increasing or decreasing the amount identified with an item and may also shift a particular cost from one cost category to another category. *Id.* § 1187.77. DPW inputs cost data from the audited cost report into its Nursing Information System (NIS), which is the "comprehensive automated database of nursing facility, resident and fiscal information needed to operate the Pennsylvania Case–Mix System." *Id.* § 1187.2. Following this step, providers have the opportunity to challenge the audit results through a hearing by filing an appeal. *Id.* § 1187.141(a)(2).

In the second step of the rate-setting process, DPW considers the allowable costs from the three most recent audit reports to establish peer group prices for the three cost categories. DPW develops peer group pricing (PGP) based upon the data collected from the audits of individual providers in a particular peer group.

---

. . .

(2) A nursing facility's appeal of the decisions listed in subsection (a)(2)-(10) shall be filed within 30 days of the date of the Department's letter transmitting or notifying the facility of the decision.

(d) A nursing facility's appeal shall meet the following requirements:

(1) A nursing facility's appeal shall be in writing, shall identify the decision appealed and, in appeals involving decisions identified in subsection (a)(2)-(10), shall enclose a copy of the Department's letter transmitting or notifying the nursing facility of the decision.

(2) A nursing facility's appeal shall state in detail the reasons why the facility believes the decision is factually or legally erroneous and the specific issues that the facility will raise in its appeal, including issues relating to the validity of Department regulations. In addition, a nursing facility appeal of findings in a desk or field audit report shall identify the specific findings that the facility believes are erroneous and the reasons why the findings are erroneous. Reasons and issues not stated in a nursing facility's appeal shall be deemed waived and will not be considered in the appeal or any subsequent related appeal, action or proceeding involving the same decision. *Desk or field audit findings not identified in a nursing facility appeal will be deemed final and will not be subject to challenge in the appeal or any subsequent related appeal, action or proceeding involving the same desk or field audit.*

. . .

(f) The Department may reopen an audit or a prior year's audit if an appeal is filed. 55 Pa.Code § 1187.141 (emphasis added).

2. It is worth noting here that part of the rate-setting process is based upon DPW's placement of all such nursing facilities within "peer groups."

DPW publishes the PGPs in the *Pennsylvania Bulletin, (id.* § 1187.95(4)), and providers have a limited right to challenge the PGPs: "[Providers] may appeal the peer group prices only as to the issue of whether the peer group prices were calculated in accordance with § 1187.96 (relating to price and rate setting computations)." *Id.* § 1187.141(a)(1).

Once DPW has completed the audit and PGP steps, it establishes an individual provider's ultimate reimbursement rate for the future year. As the administrative law judge (ALJ) explained in the decision now on appeal:

> Using the data in the NIS database[, which incorporates audit information,] *the MA Program compares the average of the facility's allowable costs in the three most recent audited reports against the peer group prices for the three cost categories,* limits the sub-rate for those cost categories in accordance with the regulations, and determines an amount for reimbursement of capital costs. *Id.* Quarterly adjustments for the acuity level of the facility's residents are also made and a budget adjustment factor applied. The calculation is issued to the nursing facilities in a rate notice. The facilities have the right to appeal the rate notice. 55 Pa.Code § 1187.141.

(ALJ decision at 8 (emphasis added).)

Providers appealed their final rate notices for particular fiscal years.[3] In those appeals, Providers attempted to challenge, for the first time, their audit results, which DPW used pursuant to its regulations to establish the Case–Mix Rates. The ALJ determined, however, that Providers were precluded from challenging DPW's audit adjustments because Providers had failed to file appeals when they were notified of the audit results, as provided in Section 1187.141 of the regulations. In so doing, the ALJ considered but rejected Providers' arguments.

Providers' position was grounded in the Act of December 3, 2002, P.L. 1147 (Act 142), codified in part at 67 Pa.C.S. §§ 101, 1101–06. Section 1102(a) of Act 142, 67 Pa.C.S. § 1102(a), provides as a "general rule":

> A provider that is *aggrieved* by a decision of the department regarding the program may request a hearing before the [B]ureau in accordance with this chapter.

(Emphasis added.) In regulations promulgated to implement this general rule, DPW defines "aggrieved" as follows:

> A provider is aggrieved by an agency action if the action adversely affects the personal or property rights, privileges, immunities, duties, liabilities or obligations of the provider.

55 Pa.Code § 41.31. Providers argued that the general hearing right in Section 1102(a) superseded, or replaced, any DPW regulation that would afford the Bureau the authority to hear an appeal by a party who is *not,* or not yet, aggrieved by a DPW decision. Providers contended that 55 Pa.Code § 1187.141, providing the right to appeal DPW's audit findings, falls into this category and thus cannot be applied to Providers because it allows for an appeal by a party who merely does not "agree" with the audit results, which is a lesser standard than being aggrieved. Providers contend that they filed their timely appeals under Section 1102(a) once they received

---

**3.** The particular yearly rate notices that Providers challenged varied among Providers. For example, Carbondale Nursing Home challenged the "Final Rates for Year 11 (Fiscal Year Ending June 30, 2006)," including quarterly rate adjustments, (Reproduced Record (R.R.) at 2a), while The Manor at St. Luke Village challenged the "Final Rates for Year 12," which is the fiscal year ending June 30, 2007 (R.R. at 77a).

notice of their new rates from DPW and that they were not aggrieved until they received the new rate notices.

The ALJ concluded that the general hearing right afforded by Act 142 and codified in Title 67, Chapter 11 of the Pennsylvania Consolidated Statutes did not supersede 55 Pa.Code § 1187.141. The ALJ regarded the pertinent provisions of Act 142 and the new regulations as establishing procedures for the Bureau's new adjudicatory responsibilities, as vested in Act 142. The ALJ concluded that the statute and regulations, both new and old, could be construed to give effect to all of the provisions. The ALJ also implied that the audit findings aggrieved the Providers, and, therefore, the audit findings constituted an agency action that Providers could appeal even under Act 142. (ALJ Decision at 9.)

Now on appeal,[4] Providers essentially raise the same argument—*i.e.*, that Section 1187.141(a) of DPW's regulations was superseded by Act 142 and the requirement that a party be "aggrieved" before it can file any appeal with the Bureau, including an audit appeal. Providers also contend that they were not aggrieved by the audit results until DPW announced the new Case–Mix Rates based on the audit results. Thus, they filed a timely appeal under Act 142. Providers also argue that DPW failed to provide them sufficient notice of the audit results and thus they would be deprived of their state and federal due process rights if they are prohibited from challenging the audit results now. Like the ALJ below, we, too, reject Providers' position.

As this Court explained in *Baptist Home of Philadelphia v. Department of Public Welfare*, 910 A.2d 760 (Pa.Cmwlth.2006), *appeal denied*, 592 Pa. 760, 923 A.2d 411 (2007), the passage of Act 142 in 2002 followed years of uncertainty over whether rate disputes between providers and DPW should be resolved before the Bureau or the Board of Claims. In *Baptist Home*, we recounted our decision in *Department of Public Welfare v. River Street Associates*, 798 A.2d 260 (Pa.Cmwlth.), *appeal denied*, 569 Pa. 710, 805 A.2d 526 (2002), issued prior to the enactment of Act 142, noting that in *River Street Associates* "[w]e held that a challenge to the rate levels established in a regulation had to be presented to [DPW], not the Board of Claims, for resolution." *Baptist Home*, 910 A.2d at 763. We further explained that the General Assembly, subsequent to our decision in *River Street Associates*, passed Act 142, and the Governor signed it into law on December 3, 2002:

> Act 142 amended Titles 62 (Procurement) and 67 (Public Welfare) of the Pennsylvania Consolidated Statutes that effected two important changes in the law.
>
> First, Section 12.2 of Act 142 added a new Subchapter C to the Procurement Code, 62 Pa.C.S. §§ 1721–1726. Subchapter C reconstituted the Board of Claims and, *inter alia*, divested it of jurisdiction over Medical Assistance provider reimbursement disputes. 62 Pa. C.S. § 1724(c).
>
> Second, Section 20.1 of Act 142 amended Title 67 by establishing the basic procedures to be followed in hearings before the Bureau of Medical Assis-

---

**4.** Our standard of review is limited to determining whether the ALJ committed an error of law, violated constitutional rights, and whether substantial evidence supports the findings of fact. 20 Pa.C.S. § 794. "On appeal from the entry of summary judgment, the appellate court may reverse [the order of the administrative agency] where there has been an error of law or a clear or manifest abuse of discretion." *Global Eco–Logical Servs., Inc. v. Dep't of Envtl. Prot.*, 789 A.2d 789 (Pa. Cmwlth.2001).

tance program appeals. In addition, the General Assembly directed the Department to issue a standing order that would provide more specific procedures for appeals conducted by the Bureau. The Bureau complied with this directive by publishing the Standing Order in the Pennsylvania Bulletin on June 28, 2003, with an effective date of July 1, 2003. 33 Pa. Bull. 3053 (June 28, 2003).

*Id.* at 763–64 (footnotes omitted). DPW would later promulgate the regulations found in Chapter 41 of Title 55 of the Pennsylvania Code, which supplanted the Standing Order as the rules of procedure before the Bureau. 67 Pa.C.S. §§ 1102(g), 1106(a).

■ For purposes of the MA program, then, the salient purpose of Act 142 was to place firmly in the Bureau's jurisdiction, and to remove from the Board of Claim's jurisdiction, disputes between MA providers and DPW arising out of the MA program. We see nothing in Act 142 that was intended to repeal, alter, or supersede the Department's regulations that set forth the process by which DPW establishes the Case–Mix Rates for MA providers, as found in Chapter 1187 of Title 55 of the Pennsylvania Code. Those procedures include, *inter alia,* opportunities for MA providers to interpose objections following each of the first two steps in the ratemaking process by filing a timely appeal with the Bureau. 55 Pa.Code § 1187.141(a)(1), (2). With respect to audit results, the regulations expressly provide that absent an appeal, the results will be deemed final: "Desk or field audit findings not identified in a nursing facility appeal will be deemed final and will not be subject to challenge in the appeal or any subsequent related appeal, action or proceeding involving the same desk or field audit." *Id.* § 1187.141(d)(2).

Moreover, the DPW regulations adopted pursuant to Act 142 expressly preserve the applicability of other DPW regulations relating to MA provider appeals, "except as specifically superseded in relevant sections of this chapter." 55 Pa.Code § 41.1(b). We see no provision in Chapter 41 of the DPW regulations that specifically supersedes the right to appeal audit results in Chapter 1187, whether the audit results render the provider "aggrieved" or not. As noted above, this particular appeal right is embedded in the procedures DPW established to set rates for Medicaid providers. It is clearly intended to address at the earliest possible time in the rate-setting process any disputes over the audit results, which will be used in later steps of the rate-setting process to ultimately establish the Case–Mix Rate. Raising any objections at this point in the rate-setting process allows DPW the opportunity to correct any errors in the audit before proceeding to the second and third steps. *See id.* § 1187.141(f) ("The Department may reopen an audit or a prior year's audit if an appeal is filed.").

DPW's judgment, as set forth in the regulation, that failure to raise any objections to the audit at this juncture will be deemed a waiver of any such objections later in the rate-setting process is not offensive. To the contrary, it is consistent with the concept of waiver as it applies to issue preservation in administrative proceedings, as recognized by the Pennsylvania Supreme Court: "[T]he administrative law tribunal must be given the opportunity to correct its errors as early as possible." *Wing v. Unemployment Comp. Bd. of Review,* 496 Pa. 113, 117, 436 A.2d 179, 181 (1981).[5]

---

5. Of course, for waiver to apply in the administrative setting, the party against whom waiver is asserted must have been afforded an opportunity to raise the allegedly waived issue

Finally, we reject Providers' due process argument. "The principles of due process require that parties be given notice the adjudicating body is considering specified information." *Pa. Bankers Assoc. v. Pa. Dep't of Banking*, 981 A.2d 975, 995 (Pa.Cmwlth.2009). "Notice is the most basic requirement of due process.... Notice should be reasonably calculated to inform interested parties of the pending action, *and the information necessary to provide an opportunity to present objections.*" *Pa. Coal Mining Ass'n v. Ins. Dep't*, 471 Pa. 437, 452–53, 370 A.2d 685, 692–93 (1977) (emphasis added). Providers argue that they lacked adequate notice for purposes of due process at the time DPW provided them with their audit results, because DPW did not also inform Providers whether the adjustments would place them above or below their respective PGP. Where a provider stands in relation to PGP ultimately impacts the provider's Case–Mix Rate.

At the time DPW gives notice of the audit adjustments, however, the question is not how those adjustments impact the Case–Mix Rates. The question, instead, is only whether the DPW audit adjustments are correct and/or appropriate. As noted above, when DPW receives a provider's cost report, it conducts an audit of the cost report, and DPW may adjust the items in a cost report by increasing or decreasing the amount identified with an item and may also shift a particular cost from one cost category to another category. *Id.* § 1187.77. In giving notice of the audit adjustments to a provider, DPW is informing the provider that, in DPW's view, the

provider recorded an improper cost amount or mischaracterized a particular cost. As noted above, by DPW regulation, providers are on notice that DPW will use facts adduced from the audit, unless objected to, to set Case–Mix Rates. Thus, to the extent a provider disagrees with an audit adjustment, the provider has sufficient notice at the time of the DPW adjustment, such that it can lodge an objection and due process is satisfied.

For the reasons set forth above, we reject Providers' principal argument that Act 142 and the regulations promulgated pursuant thereto supersedes or replaces the rate-setting procedures set forth in Chapter 1187 of DPW's regulations. Providers have not advanced any persuasive argument that DPW lacked the authority to promulgate the Chapter 1187 regulations, that DPW failed to follow the proper procedures in promulgating those regulations, or that the regulations are unreasonable. They, therefore, have the force and effect of law. *See Elkin v. Dep't of Public Welfare*, 53 Pa.Cmwlth. 554, 419 A.2d 202, 205 (1980) (en banc). Because Providers here failed to avail themselves of the opportunity set forth in Chapter 1187 to raise objections to the audit results at the earliest possible point in the rate-setting process, they waived their ability to raise those objections at the conclusion of the rate-setting process—*i.e.*, when the final rate decision is made.

Accordingly, we affirm the Bureau's order granting partial summary judgment in favor of DPW.

before the administrative proceedings. *See Pocono Manor Investors, LP v. Pa. Gaming Control Bd.*, 592 Pa. 625, 639–41, 927 A.2d 209, 217–18 (2007) (holding that unsuccessful applicant for license did not waive challenges to grant of license to successful applicant where there was no procedure by which it

could raise challenge during pendency of agency proceeding). Here, unlike in *Pocono Manor*, there was clearly a procedure in place for Providers to appeal the audit results as soon as they were issued and to have a hearing to address any objections at that time.

### ORDER

AND NOW, this 10th day of July, 2013, the order of the Department of Public Welfare, Bureau of Hearings and Appeals, is AFFIRMED.