# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mulberry Square Elder Care :
and Rehabilitation Center, :
     Petitioner : No. 371 C.D. 2017
        : Argued: April 11, 2018
    v.    :
        :
Department of Human Services, :
     Respondent :

BEFORE: HONORABLE MARY HANNAH LEAVITT, President Judge
    HONORABLE ROBERT SIMPSON, Judge
    HONORABLE PATRICIA A. McCULLOUGH, Judge
    HONORABLE ANNE E. COVEY, Judge
    HONORABLE MICHAEL H. WOJCIK, Judge
    HONORABLE CHRISTINE FIZZANO CANNON, Judge
    HONORABLE ELLEN CEISLER, Judge

OPINION
BY JUDGE SIMPSON     FILED: JULY 26, 2018

In this complex and mature litigation, Mulberry Square Elder Care and Rehabilitation Center (Nursing Facility) petitions for review from an order of the Secretary of the Department of Human Services (Department). The Secretary affirmed the Bureau of Hearings and Appeals' (BHA) order adopting the Administrative Law Judge's (ALJ) recommendation denying relief and rejecting Nursing Facility's billing practice. Specifically, the Department disallowed Nursing Facility's practice of recouping unpaid copayments from residents eligible for medical assistance by billing the Department for the copays as medical expenses. The Department also concluded this practice constituted balance-billing prohibited by applicable law. Nursing Facility argues the Department did not promulgate a regulation explicitly precluding its billing practice. Discerning no error below, we affirm.

# I. Background

This case involves the interplay between the Medicare and Medicaid programs, and the ultimate source of funding for covered services, when a participating provider renders services to individuals eligible for medical assistance under both programs. Nursing Facility billed the Department for amounts corresponding to services for which payment was limited to the Medicaid rate, resulting in the Department paying more than the maximum Medicaid rate for the services.

## A. Statutory Framework
### 1. Generally

Medicaid, established by Title XIX of the Social Security Act, 42 U.S.C. §§1396–1396v, is a cooperative federal-state program through which the federal government funds the states to provide medical assistance to low-income persons. Participating states[1] must submit a "State Plan" to the federal Department of Health and Human Services for approval. The State Plan establishes financial eligibility criteria and identifies covered services and corresponding rates. The federal Department of Health and Human Services approved Pennsylvania's State Plan, the Medical Assistance (MA) Program.

In addition to need-based Medicaid, medical assistance is available to individuals aged 65 or older under Title XVIII of the Social Security Act through Medicare. Medicare is comprised of two principle parts: Part A (for inpatient hospital and post-hospital care), 42 U.S.C. §§1395c-1395i-5; and Part B (for physician services and outpatient services), 42 U.S.C. §§1395j-1395w-4. Individual enrollment

---

[1] States that elect to participate in Medicaid must comply with all applicable federal statutory and regulatory requirements. See 42 U.S.C. §1396a; 42 C.F.R. Part 430.

2

in Medicare Part A is automatic based on age. Enrollment in Part B is voluntary, offering participating individuals supplemental insurance for services not covered by Part A.

## 2. Cost-Sharing/Copay Limits

Part B imposes cost-sharing obligations on participating individuals for co-insurance, including deductibles, monthly premiums, and copays. Generally, this means an individual enrolled in Medicare Part B will pay co-insurance amounts, including copays corresponding to Part B services. As the elderly poor may not have the financial means to pay cost-sharing amounts, Medicaid funds are used to enroll individuals qualifying for both Medicare and Medicaid, known as "dual eligibles," in Medicare Part B by paying their cost-sharing obligations. 42 U.S.C. §1395v, §1396a(a)(10)(E). Once dual eligibles are enrolled, Medicare directly reimburses providers for 80% of the reasonable charges for Part B services. Part B copays, including those payable through Medicaid, are intended to cover the remaining 20%.

However, Congress amended Medicaid through Section 4714 of the Balanced Budget Act of 1997, regarding state liability for Medicare cost-sharing (1997 Amendment), 42 U.S.C. §1396a(n). The 1997 Amendment clarified that a state is not required to make any payment for any incurred expenses "relating to payment for … copayments for [M]edicare cost-sharing to the extent the payment under [Medicare] for the service would exceed the payment amount that otherwise would be made under the State Plan." Id. at §1396a(n)(2) (emphasis added).

The 1997 Amendment expressly caps a state's payment at the Medicaid rate for Medicare cost-sharing, including Part B copays. This Medicaid rate cap applies even when the Medicare rate is equal to or greater than the rate set forth in the State Plan, thereby eliminating a state's payment obligation. 42 U.S.C. §1396a(n)(3). The 1997 Amendment also provided in pertinent part:

> (A) for purposes of applying any limitation under title XVIII on the amount that the [qualified Medicare beneficiary] may be billed or charged for the service, the amount of payment made under title XVIII plus the amount of payment (if any) under the State plan shall be considered to be payment in full for the service;
>
> (B) the [qualified Medicare beneficiary] shall not have any legal liability to make payment to a provider … for the service; and
>
> (C) any lawful sanction that may be imposed upon a provider … for excess charges under this title or title XVIII shall apply to the imposition of any charge imposed upon the individual in such case.

Id. (emphasis added). Thus, under this provision, the legal liability of a qualified Medicare beneficiary, such as the legal liability of a resident in a nursing facility to pay that facility, is limited.

The Department administers the MA Program (Medicaid) for the Commonwealth. The Human Services Code (the Code)[2] vests the Department with the authority to establish rules, regulations, and standards for programs it administers. The Department's administration of the MA Program must comply with federal law. Thus, the approved State Plan must comply with federal law.

---

[2] Act of June 13, 1967, P.L. 31, as amended, 62 P.S. §§101-1503 (formerly the Public Welfare Code, retitled in 2015 as the Human Services Code).

Shortly after enactment of the 1997 Amendment, the Department issued a notice in the Pennsylvania Bulletin that it was amending the State Plan "to specify that the Department <u>will not pay Medicare cost-sharing amounts</u> related to any services <u>to the extent that the payments made under the Medicare Program exceed the payments that would be made by the [MA] Program for such services</u> if provided to an eligible [MA] recipient." Reproduced Record (R.R.) at 745a (emphasis added). The amendment to the State Plan, effective January 1, 1998, conformed to federal law as set forth in the 1997 Amendment. <u>Id.</u>

As amended, the State Plan provides the MA Program will pay for unsatisfied Medicare cost-sharing for Part B services provided to dual eligibles <u>up to the fee allowable under the MA Program for covered services</u>. <u>See</u> R.R. at 750a. It specified MA "<u>will not pay Medicare cost-sharing</u>" when the Medicare payment for the service "exceeds the applicable [MA] fee or payment" for the service. <u>Id.</u> (emphasis added).

The Department explained its change to the State Plan in MA Bulletin No. 35-98-10, 36-98-10 (MA Bulletin). The MA Bulletin echoed the language of the 1997 Amendment, stating the MA fee – which is Pennsylvania's Medicaid rate for services – "**is the maximum payment that may be received by the facility for services provided to both [dual eligible] residents and non-QMB**[3] **MA residents.**" R.R. at 669a (bold in original). It also restated this Medicaid rate cap applied to Medicare cost-sharing amounts, including Part B copays.

_____

[3] The abbreviation QMB refers to qualified Medicare beneficiaries.

**B. MA Participation and Payments to Nursing Facilities**

The MA Program pays nursing facility providers a "per diem rate" on behalf of MA-eligible residents for room, board, and related services. 55 Pa. Code §1187.2 (corresponding to facility rate of payment per resident day). The MA Program also pays the allowable fees for Medicare Part B services provided to MA-eligible residents in participating nursing facilities. However, the MA Program does not pay *any* fees for Part B services if the amount paid to the nursing facility by Medicare covers or exceeds the fee set by the MA Program. Because the MA fees are "almost always lower" than the amount Medicare pays, participating providers may receive only 80% of the reasonable charge for Part B services from Medicare, with no payment from the MA Program for the remaining 20% (i.e., Part B copay). R.R. at 1172a (ALJ Recommendation).

A patient "who is eligible for MA and has monthly income ([Social Security], pensions, etc.) may be responsible for a patient pay liability to the facility." ALJ's Recommendation, 7/28/16, Finding of Fact (F.F.) No. 7. The local County Assistance Office calculates the amount based on the patient's financial eligibility (Patient Liability). This Patient Liability is subtracted from the per diem rate paid to a nursing facility under the MA Program. For example, if the monthly Patient Liability is $1,000, and the MA per diem rate is $200, equaling $6,000 (30 days x $200/day), the Department will pay a nursing facility $5,000 ($6,000-$1,000). Id. at n.2.

Providers that elect to participate in the MA Program enter into provider agreements setting the terms for MA-covered services. Participating providers must

agree to accept reimbursement from the state at its Medicaid rate as "payment in full." 42 C.F.R. §447.15. Providers are prohibited from demanding additional payment from patients. 42 U.S.C. §1396a(a)(25)(C), §1396*o*, §1396(n)(3)(B).

In Pennsylvania, participating providers are subject to Pennsylvania's Provider Handbook, PROMISe™. Section 4.9 of the Provider Handbook explains that for dual eligibles, "the Medicare [P]rogram must be billed first if the service is covered by Medicare. Payment will be made by MA for the Medicare Part B deductible and co[-]insurance [such as copays] up to the MA fee." R.R. at 573a (emphasis added). So when the MA fee is insufficient, Part B copays are left unpaid.

Deductions from the Patient Liability amount are permitted for "Other Medical Expenses." "Other Medical Expenses" are costs of medical goods or services "incurred during that month." F.F. No. 10 (emphasis added). The nursing facility debits the Patient Liability for these "other medical expenses" that are ultimately paid under the MA Program. The nursing facility then bills the MA Program for the amount of the "other medical expenses" to offset the amount subtracted from the Patient Liability. Billing for "other medical expenses" in this manner, and deducting costs from Patient Liability, is permitted. F.F. No. 10.

In practice, when a nursing facility resident receives a pair of glasses that costs $300, the glasses qualify as "other medical expenses." Id. at n.3. In this example, a nursing facility deducts the $300 cost incurred for the glasses from the resident's $1,000 Patient Liability, resulting in a Patient Liability of $700. Importantly, a reduction in the otherwise unrecoverable Patient Liability for "other

7

medical expenses" effectively increases the amount paid to a nursing facility by the MA Program. Using the eyeglasses example, because the Department pays the nursing facility its per diem rate for room and board ($6,000) minus the Patient Liability ($700) through the MA Program, the MA Program pays the nursing facility $5,300, instead of $5,000 in the absence of a deduction for "other medical expenses."

## C. Disputed Billing Practice

This case involves Nursing Facility's attempt to recover part of the otherwise unrecoverable Part B copays by utilizing its residents' Patient Liability amounts.

In 2009, on the advice of counsel, Nursing Facility, and other nursing facilities owned by Guardian Elder Care LLC (Guardian), began billing the MA Program for dual eligible residents' Part B copays by including them as an "other medical expense" (Disputed Billing Practice).[4] Most of Nursing Facility's residents are dual eligibles. Using the Disputed Billing Practice, Nursing Facility attempted to recoup unpaid copays corresponding to Part B services by deducting the amount of the copays from Patient Liability amounts as it is permitted to do for "other medical expenses." Then, Nursing Facility billed the Department for Part B copays as for any other "other medical expenses." Because they were included as routine "other medical expenses," the MA Program paid the Part B copays. In so billing, Nursing Facility sought more than the MA fee for the Part B service. As a result, the MA Program paid more than the maximum MA fee.

---

[4] Prior to 2009, Nursing Facility did not bill the MA Program for Part B copays.

Nursing Facility receives 80% of the "reasonable charge" for Part B services directly from Medicare. In almost all cases, the Medicare amount (80%) is higher than the maximum allowed fee for the same service under the MA Program. R.R. at 279a. Because providers agree to accept the MA fee as payment in full, and Medicare paid the MA fee amount, providers may not recover the Part B cost-sharing, i.e., copays, from the state. Nursing Facility engaged in the Disputed Billing Practice in order to recoup the remaining 20% corresponding to Part B copays.

Nursing Facility executed a provider agreement with the Department, to participate in the MA Program, effective January 1, 1997. R.R. at 757a (Provider Agreement). Nursing Facility agreed to comply with applicable federal and state law governing the Medicare and Medicaid programs. As a participating provider, Nursing Facility received the Provider Handbook explaining proper billing practices.

## D. Procedural History

This litigation stems from the Department's review of Nursing Facility in 2011 for the billing cycle of January 2009 through December 2009. During this period, Nursing Facility and other Guardian-owned facilities engaged in the Disputed Billing Practice.

The Department prepared a Field Operations Review Summary seeking claims adjustments based on the Disputed Billing Practice. It disallowed the Disputed Billing Practice for using incorrect Patient Liability amounts, and for billing Part B copays as "other medical expenses." Nursing Facility appealed the Department's Field Summary and related claims adjustments in April 2011.

Nursing Facility agreed to an administrative hearing to allow the underlying appeal as a test case, such that the ruling would apply to all 22 Guardian facilities that engaged in the Disputed Billing Practice.[5]

The ALJ held a two-part hearing in February 2015. The ALJ found the testimony of all of the witnesses credible. F.F. No. 21. Based on the briefs and the evidence, the ALJ determined the Department properly denied the claims in which Nursing Facility used its Disputed Billing Practice to recoup Part B copays as "other medical expenses." Accordingly, the ALJ denied relief. Nursing Facility appealed to the BHA.

The BHA issued an order adopting the ALJ's recommendation. Nursing Facility timely requested reconsideration. After granting reconsideration, the Secretary upheld the BHA's decision. Nursing Facility then petitioned this Court for review.

After briefing and argument before this Court en banc, the matter is ready for disposition.

## II. Issues

The ultimate issue before this Court is whether the Department properly disallowed Nursing Facility from recouping residents' Part B (e.g., physician and physical therapy services) copays by deducting them from Patient Liability, and

---

[5] Guardian filed appeals related to the Disputed Billing Practice on behalf of three of its other facilities: Jefferson Hills Manor (Dkt. #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); Lakeview Senior Care (Dkt. #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); and Scottsdale Manor (Dkt. #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).

10

billing the Department for the copays as "other medical expenses." The parties also dispute whether Nursing Facility engaged in balance-billing.

### III. Discussion

On appeal,[6] Nursing Facility argues the Department had no basis for disallowing its attempt to recover Medicare Part B copays through the Disputed Billing Practice. Specifically, it challenges the MA Bulletin as grounds to bar the Disputed Billing Practice when the Department did not promulgate it as a regulation. Further, it maintains the regulation pertaining to Medicare co-insurance, 55 Pa. Code §1187.102, applies only to Medicare Part A (relating to inpatient facility care). Nursing Facility also contends deducting Part B copays from the Patient Liability does not constitute balance-billing because the MA Program pays the Part B copays, not the residents.

The Department responds that the Disputed Billing Practice directly violates federal and state law. The Department maintains it may enforce federal law without implementing a specific regulation. It also argues the Nursing Facility's deduction of copays corresponding to Part B services (e.g., physical therapy) from Patient Liability to recover the unpaid 20%, which is the balance of the reasonable charge paid by Medicare for the Part B service, constitutes balance-billing.

---

[6] Our review is limited to whether the "adjudicatio[n] [is] in accordance with the law as well as agency regulations or procedures, whether any constitutional rights were violated, and whether the findings of fact are supported by substantial evidence." Univ. of Pittsburgh, Sys. of Higher Educ.,W. Psychiatric Inst. & Clinic v. Dep't of Pub. Welfare, 616 A.2d 149, 152 n.3 (Pa. Cmwlth. 1992); see Schell v. Dep't of Pub. Welfare, 80 A.3d 844 (Pa. Cmwlth. 2013).

11

## A. Source of Agency Authority

First, we consider Nursing Facility's contention that the Department lacks authority for disallowing the Disputed Billing Practice. Essentially, it asserts the sole source for the Department's authority to disallow the practice is the MA Bulletin. Because the MA Bulletin was not promulgated as a regulation, and is instead a statement of policy, Nursing Facility maintains it is unenforceable.

We discern no merit in Nursing Facility's contentions. At the outset, we disagree that the Department's position depends upon the MA Bulletin's validity as a regulation. The Department had additional legal grounds for disallowing the Disputed Billing Practice, found in federal and state law and documents governing Nursing Facility's participation in the MA Program.

In focusing on the MA Bulletin, Nursing Facility digresses from the ultimate issue in this case: whether the Disputed Billing Practice is disallowed. Regardless, the MA Bulletin represents an example of the Department's interpretive authority.

## 1. MA Fee Cap

Under the Disputed Billing Practice, Nursing Facility received payments from the MA Program – in excess of the MA fee – corresponding to Part B copays. By so doing, Nursing Facility disregarded federal and state laws that provide the MA Program shall be a payer of last resort and is not responsible to pay more than the MA fee for a covered service. These laws apply regardless of any shortfall providers experience when the MA fee is insufficient to cover 100% of the reasonable charge for Part B services.

The 1997 Amendment clarified that Medicaid, 42 U.S.C. §1396a(n), did not require state Medicaid programs to pay Medicare cost-sharing amounts when to do so would require states to pay more than the Medicaid rate. Recognizing that providers may not receive 100% of the reasonable charge with this limitation, the 1997 Amendment prohibited providers from holding patients liable for the shortfall.

In a series of cases decided around the time Congress enacted the 1997 Amendment, a number of our sister jurisdictions construed its effect. Most courts held a state may limit its cost-sharing obligation to the Medicaid fee. See McCreary v. Offner, 172 F.3d 76 (D.C. Cir. 1999); Paramount Health Sys., Inc. v. Wright, 138 F.3d 706 (7th Cir. 1998); Blecker v. State, 733 A.2d 540 (N.J. Super. 1999) (holding federal amendment explicitly permitted states to limit their Medicare cost-sharing payments to Medicaid rates; 1997 Amendment clarified existing law); Kulkarni v. Leean, No. 96-C-884, 1997 WL 527674 (W.D. Wis. June 23, 1997) (upholding cap on provider compensation at Medicaid rate).[7] But see Williams v. Hank's Amb. Serv., Inc., 699 So.2d 1230 (Ala. 1997) (upholding trial court decision that state must pay Medicare rate, not merely Medicaid rate). The courts recognized that while the providers looked to the state Medicaid program for the 20% copay, the Medicaid rates are typically less than the Medicare reasonable charges for the same service. As a result, copays are not recoverable from the state.

Because dual eligibles are funded by both Medicare and Medicaid, a provider's ability to obtain the 20% copay from a dual eligible resident is restricted

---

[7] Providers argued the state plan violated Medicaid because the state administrator did not pay them the difference between the Medicare reasonable rate and the 80% paid by Medicare (i.e., Part B copay) for services rendered to dual eligibles. The federal district court disagreed, reasoning the agency's policy choice for administering Medicaid funds was proper and entitled to deference.

by the Medicaid cap contained in the 1997 Amendment. When a provider elects to participate in the MA Program, it agrees to accept payments under the MA Program as "payment in full." 42 U.S.C. §1396a(n)(3); 42 C.F.R. §447.15. That rule applies regardless of whether Medicare funded the entire amount of the MA Program fee such that the MA Program paid nothing.

"By opting for reimbursement from Medicaid, a provider purchases certainty; a guarantee of partial payment in lieu of possibly full payment or possibly no payment at all." Evanston Hosp. v. Hauck, 1 F.3d 540 (7th Cir. 1993). Should a provider wish "to preserve its right to seek its entire customary charge," the provider may choose not to participate in the MA Program. Nickel v. Workers' Comp. Appeal Bd. (Agway Agronomy), 959 A.2d 498, 506 (Pa. Cmwlth. 2008).

Federal law precludes participating providers from receiving payment above the amount paid by Medicaid. Id. "Service providers who participate in the Medicaid program are required to accept payment of the state-denoted Medicaid fee as payment in full ... and may not attempt to recover any additional amounts elsewhere." Id. at 507 (emphasis added) (quoting Rehab. Ass'n of Va., Inc. v. Kozlowski, 42 F.3d 1444, 1447 (4th Cir. 1994), cert. denied, 516 U.S. 811 (1995)); see also Lizer v. Eagle Air Med Corp., 308 F. Supp. 2d 1006, 1009 (D. Ariz. 2004) (federal regulations "preven[t] providers from billing any entity for the difference between their customary charge and the amount paid by Medicaid.").

Here, in conformity with federal law, the State Plan limits the MA Program's responsibility for Medicare cost-sharing to the MA fee. R.R. at 750a.

Indeed, the State Plan specifies that "[MA] will not pay Medicare cost-sharing amounts related to any service to the extent that the payment made under the Medicare Program for the service exceeds the applicable [MA] fee or payment." Id. (emphasis added). We "grant great deference to that plan …." Presbyterian Med. Ctr. of Oakmont v. Dep't of Pub. Welfare, 792 A.2d 23, 27 (Pa. Cmwlth. 2002).

The State Plan authorized the Department to eliminate its obligations for Medicare cost-sharing for dual eligibles when a provider received payment from Medicare Part B in an amount equal to or greater than the MA fee. R.R. at 750a. Importantly, Nursing Facility does not dispute that in almost all cases, the Medicare payment for Part B services exceeds the MA fee for the same service. R.R. at 1172a.

Under the Disputed Billing Practice, Nursing Facility billed the Department for Part B copays, causing the MA Program to pay more than the MA fee for the service. Thus, Nursing Facility disregarded the MA cap in the State Plan. Because the Disputed Billing Practice is contrary to federal law and the State Plan, the Department properly denied Nursing Facility's appeal.

### 2. Regulatory Authority

Notwithstanding that federal law and the State Plan limit providers to payments *up to* the MA fee for Part B services, Nursing Facility asserts Department regulation, 55 Pa. Code §1187.102 (Regulation), allows the Disputed Billing Practice. We disagree.

15

Section 1187.102,[8] entitled "Utilizing Medicare as a resource," refers to Medicare Part B and "per diem rates" corresponding to Medicare Part A. Id. The parties agree the Regulation pertains primarily to Part A services. With regard to Part B services, it provides Medicare benefits shall be exhausted before any payment is made under the MA Program. 55 Pa. Code §1187.102(b). Unlike the provisions pertaining to Part A (inpatient facility care), the Regulation does not set a cap for Part B (physician/therapy services) co-insurance. Unlike the State Plan, the Regulation does not address a cap on the MA Program's responsibility for Part B cost-sharing.

---

[8] Section 1187.102 states in full:

(a) An eligible resident who is a Medicare beneficiary, is receiving care in a Medicare certified nursing facility and is authorized by the Medicare Program to receive nursing facility services shall utilize available Medicare benefits before payment will be made by the MA Program. If the Medicare payment is less than the nursing facility's MA per diem rate for nursing facility services, the Department will participate in payment of the co[-]insurance charge to the extent that the total of the Medicare payment and the Department's and other co[-]insurance payments do not exceed the MA per diem rate for the nursing facility. The Department will not pay more than the maximum co[-]insurance amount.

(b) If a resident has Medicare Part B coverage, the nursing facility shall use available Medicare Part B resources for Medicare Part B services before payment is made by the MA Program.

(c) The nursing facility may not seek or accept payment from a source other than Medicare for any portion of the Medicare co[-]insurance amount that is not paid by the Department on behalf of an eligible resident because of the limit of the nursing facility's MA per diem rate.

(d) The Department will recognize the Medicare payment as payment in full for each day that a Medicare payment is made during the Medicare-only benefit period.

(e) The cost of providing Medicare Part B type services to MA recipients not eligible for Medicare Part B services which are otherwise allowable costs under this part are reported in accordance with §1187.72 (relating to cost reporting for Medicare Part B type services).

55 Pa. Code §1187.102.

16

However, the absence of an express cap on co-insurance with regard to Part B services does not mean the Regulation authorizes billing the MA Program for Part B copays, as Nursing Facility suggests. The Regulation is merely silent. Moreover, the Department has other sources of authority, through rulemaking and policy-making, at its disposal.

The Code vests the Department "with responsibility for administration of the [MA] [P]rogram … and for 'establish[ing] rules, regulations and standards ... as to eligibility for assistance and as to its nature and extent.'" Dep't of Pub. Welfare v. Devereux Hosp. Tex. Treatment Network (K.C.), 855 A.2d 842, 846 (Pa. 2004) (quoting Section 403(b) of the Code, 62 P.S. §403(b)). Pursuant to its authority, the Department enacts regulations and policies to ensure the MA Program implements the State Plan and is consistent with federal law. This Court defers to "[the Department's] interpretation of its own regulations unless they are unreasonable or inconsistent with federal regulations." Presbyterian Med. Ctr., 792 A.2d at 27.

Agency "regulations"[9] must be promulgated pursuant to the notice and comment procedures contained in the Commonwealth Documents Law[10] in order to

---

[9] Section 102 of the Commonwealth Documents Law defines "regulation" as:

> [A]ny rule or regulation, or order in the nature of a rule or regulation, promulgated by an agency under statutory authority in the administration of any statute administered by or relating to the agency, or prescribing the practice or procedure before such agency.

Act of July 31, 1968, P.L. 769, as amended, 45 P.S. §1102.

[10] Act of July 31, 1968, P.L. 769, as amended, 45 P.S. §§1102–1602.

17

have the force and effect of law. Hillcrest Home, Inc. v. Dep't of Pub. Welfare, 553 A.2d 1037 (Pa. Cmwlth. 1989). However, an agency may also set forth guidelines in "statements of policy."[11]

In terms of their practical effect, our Supreme Court explained the distinction between statements of policy and regulations as follows: "A general statement of policy … announces the course which the agency intends to follow in future adjudications." Pa. Human Relations Comm'n v. Norristown Area Sch. Dist., 374 A.2d 671, 679 (Pa. 1977). By contrast, "[a] properly adopted substantive rule establishes a standard of conduct which has the force of law," establishing a "binding norm." Id.; see Prof'l Ins. Agents Ass'n of Pa., Md. & Del., Inc. v. Koken, 777 A.2d 1179, 1186 (Pa. Cmwlth. 2001).

The Department exercised its interpretive authority construing the 1997 Amendment in the MA Bulletin. In addition to emphasizing the MA rate cap imposed on cost-sharing for Part B services quoted earlier in this opinion, the MA Bulletin states, in pertinent part:

> Nursing facilities are reminded that they may not seek or accept payment for an MA-covered service or item from a source other than Medicare for any portion of the Medicare co[-]insurance amount [e.g., Part B copays] that

---

[11] Section 102 of the Commonwealth Documents Law defines "statement of policy" as:

> [A]ny document, except an adjudication or a regulation, promulgated by an agency which sets forth substantive or procedural personal or property rights, privileges, immunities, duties, liabilities or obligations of the public or any part thereof, and includes, without limiting the generality of the foregoing, any document interpreting or implementing any act of Assembly enforced or administered by such agency.

45 P.S. §1102.

18

> is not paid by the Department on behalf of an eligible
> resident because of the limit of the nursing facilities MA
> per diem rate or MA fee, and that they may not claim
> unreimbursed cost-sharing amounts as deductions or
> expenses against patient pay amounts on the [MA] Long
> Term Care Invoice (MA 309C).

R.R. at 669a (emphasis added). The MA Bulletin describes the Disputed Billing Practice and explains it is expressly proscribed by law.

The MA Bulletin is consistent with federal law and the State Plan which provides that the MA Program will pay Medicare cost-sharing amounts (like Part B copays) *if* the payment made by Medicare for the services is less than the maximum allowable MA Fee. Indeed, the MA Bulletin cited the 1997 Amendment and discussed its effect. It confirmed that the MA per diem rate *or fee* is the maximum payment that may be received by a facility for services provided to MA residents. In offering a specific example of prohibited billing, the MA Bulletin announced the Department's construction of federal law, and its intention for future adjudications. As such, the MA Bulletin reflects the Department's interpretive authority. Borough of Bedford v. Dep't of Envtl. Prot., 972 A.2d 53 (Pa. Cmwlth. 2009).

As a statement of policy, the MA Bulletin is not subject to the publication requirements contained in Section 201 of the Commonwealth Documents Law, 45 P.S. §1201. See Norristown Area Sch. Dist. Further, notice and comment is not always required, particularly when agency practice brings the Commonwealth into compliance with federal law. Montgomery Cty. Geriatric & Rehab. Ctr. v. Dep't of Pub. Welfare, 462 A.2d 325 (Pa. Cmwlth. 1983); see Section 204 of the

19

Commonwealth Documents Law, 45 P.S. §1204. Accordingly, we reject Nursing Facility's premise that the MA Bulletin constitutes a form of improper rulemaking.

Relevant here, the MA Bulletin is "remind[ing]" nursing facilities about proper billing. R.R. at 669a. Indeed, for more than 10 years following issuance of the MA Bulletin, Nursing Facility did not attempt to recoup Part B copays from the MA Program. F.F. No. 12. Nursing Facility did not undertake the Disputed Billing Practice until 2009, without any intervening change in law or billing procedures.

Moreover, rendering the MA Bulletin invalid would not change the legality of the Disputed Billing Practice. The Department has a duty to implement the MA Program in accordance with federal law. As a participating provider, Nursing Facility has a duty to comply with applicable federal and state law, including the State Plan. There is no dispute that the State Plan mirrors the 1997 Amendment and caps payments under the MA Program at the maximum allowable fee. The Department explained its corresponding amendment to the State Plan in practical terms in the MA Bulletin. Because the MA Bulletin merely explains how the Department construed existing law, it does not constitute improper rulemaking.

In this procedural posture, Nursing Facility bore the burden to prove the propriety of the Disputed Billing Practice. Harston Hall Nursing & Convalescent Home, Inc. v. Dep't of Pub. Welfare, 513 A.2d 1097 (Pa. Cmwlth. 1986); 55 Pa. Code §41.153. The Department did not bear the burden of proving the propriety of its rulemaking. Cf. Success Against All Odds v. Dep't of Pub. Welfare, 700 A.2d 1340

20

(Pa. Cmwlth. 1997)[12] (original jurisdiction action challenging Department's proposed rule change eliminating aid payments based on change in federal law eliminating requirement that states make such payments).

Significantly, Nursing Facility cites no legal authority for recovering more than the MA fee from the Department. The State Plan states the MA fee is the maximum amount that may be paid for Part B services provided to dual eligibles. By seeking more than the MA fee, Nursing Facility also violated its Provider Agreement to accept Medicaid payments as payment in full. See 42 C.F.R. §447.15.

Further, Nursing Facility cites no authority for claiming Part B copays as "other medical expenses." We give the Department's determination as to what constitutes reimbursable expenses under the MA Program "controlling weight unless plainly erroneous or inconsistent with the regulation or underlying statute." Dep't of Pub. Welfare v. Forbes Health Sys., 422 A.2d 480, 482 (Pa. 1980). We discern no such inconsistency here.

---

[12] In Success Against All Odds v. Department of Public Welfare, 700 A.2d 1340 (Pa. Cmwlth. 1997), the petitioners sought declaratory and injunctive relief to preclude the Department from implementing a rule change following a change in federal law (Rule Change). Specifically, the Rule Change eliminated pass-through payments for child support when federal law removed the payment requirement. The prior law required states receiving federal aid to pay the family the first $50 of support. The new law allowed states the discretion to continue or discontinue the payment.

The General Assembly amended the Code stating the Department would continue payment of the pass-through only "**as required by Federal law**." Id. at 1343 (bold in original; quoting Code provision). Because federal law removed the requirement, upon which the payment was contingent, this Court concluded the Rule Change eliminating the pass-through payment followed the statutory mandate in the Code. Because the Code provision was self-executing, we reasoned the Rule Change was not subject to the Commonwealth Documents Law.

Notwithstanding the procedural differences between this appeal and the validity challenge in Success Against All Odds, like the Rule Change, the MA Bulletin did not alter existing law. It did not impose a new requirement or procedure, necessitating notice and comment. Rather, it explained the Department's construction of the 1997 Amendment, which clarified existing law.

Ultimately, Nursing Facility failed to establish the Disputed Billing Practice complied with federal and state law. Harston Hall Nursing & Convalescent Home. Therefore, the Department did not err in denying Nursing Facility's appeal.

### B. Balance-Billing

Next, we consider the BHA's conclusion that Nursing Facility engaged in balance-billing.

Medicaid provides that dual eligibles shall have no "legal liability to make payment to a provider" for Medicare cost-sharing expenses. 42 U.S.C. §1396a(n)(3)(B) (emphasis added). Holding patients liable for charges that remain unpaid by Medicare or Medicaid is balance-billing. This Court defined balance-billing "as the practice whereby a provider bills the patient directly for the balance of the reasonable costs and charges if the Medicare or Medicaid program does not pay the full amount of the reasonable costs and charges." Nickel, 959 A.2d at 504 n.10; see also Pa. Med. Soc'y v. Snider, 29 F.3d 886 (3d Cir. 1994), superseded by statute, 1997 Amendment, as recognized in Beverly Cmty. Hosp. Ass'n v. Belshe, 132 F.3d 1259 (9th Cir. 1997).

Nursing Facility maintains that the Disputed Billing Practice of debiting the Patient Liability by the amount of the Part B copay does not hold the patient "legally liable" for the copay. Nursing Facility emphasizes that residents do not pay more than their Patient Liability when the copays are charged against it, and in fact, the Department pays the amount. However, this argument ignores testimony regarding the Disputed Billing Practice and how the Patient Liability functions.

Nursing Facility held facility residents liable for the Part B copays by deducting the amount of the copay from their Patient Liability. F.F. No. 14. Patient Liability is the means through which a provider receives payment from a patient. R.R. at 116a. It represents the amount a dual eligible "resident is required to pay for their cost of care." Id. The Department permits deductions from Patient Liability for "other medical expenses," which are monthly medical costs incurred[13] by residents. 55 Pa. Code §181.452. By classifying them as "other medical expenses," Nursing Facility deemed Part B copays a cost residents were required to pay toward their care. R.R. at 121a (Guardian's Chief Financial Officer described Part B copays as an amount "the resident owes").

For example, for a $1,000 Part B service, Medicare pays Nursing Facility directly for 80%, or $800. The Part B copay is 20%, or $200. The amount of the copay represents the portion of the Medicare reasonable charge that is unpaid by Medicare or Medicaid (i.e., the balance). The MA Program does not pay the copay because its liability is capped at the MA fee. To recover the unpaid copay, Nursing Facility debits the Patient Liability by $200. By including the Part B copays in a resident's obligations, as a cost the resident *owed*, Nursing Facility holds the resident liable for the payment of the unpaid balance of a bill.

Nursing Facility admitted that through the Patient Liability it billed the resident for "other medical expenses," including Part B copays. In describing its sources of income, the Chief Financial Officer for Guardian testified, "[t]he resident would see a bill for what monthly was their obligation [the Patient Liability], and

---

[13] "Incur" is defined as "to become liable or subject to." AM. HERITAGE DICTIONARY 653 (2nd Coll. ed. 1985).

then [the Department] was also be [sic] billed for the amount that [it] would owe the facility." R.R. at 136a-37a. He explained the Disputed Billing Practice thus billed "[b]oth" the patient and the Department. Id. Based on the record, the ALJ found Nursing Facility billed dual eligibles for Part B copays through Patient Liability. F.F. No. 14.

That the amount is ultimately paid by the Department does not save the Disputed Billing Practice from constituting balance-billing. Nursing Facility would be unable to bill the Part B copays as "other medical expenses" if it did not first deem them costs owed by the residents. Absent holding the patient liable for the Part B copays through the Patient Liability (i.e., the amount the patient is responsible to pay for care), Nursing Facility obtains no access to the Department's MA Program funds.

As a factual predicate, Nursing Facility's billing of Part B copays as "other medical expenses" depends on its entitlement to receive the amount of the Part B copays as costs incurred by the resident. Pursuant to the 1997 Amendment, and the State Plan implementing it, Nursing Facility is not permitted to bill Part B copays to the Department if to do so exceeds the MA fee for the service; it is also not permitted to bill the patients for the difference between the reasonable charge and the MA fee. Here, Nursing Facility did both. See R.R. at 1179a (ALJ Recommendation).

In sum, by deducting the amount of Part B copays from Patient Liability, and representing them as costs incurred, Nursing Facility held patients liable for the

24

payments.[14] Patient Liability is the means by which Nursing Facility billed residents. R.R. at 136a-37a. By utilizing that mechanism, and including the Part B copays as costs that residents incurred, Nursing Facility held dual eligibles legally liable for their payment without collecting the amount from the residents. By so recouping the unpaid balance of the Medicare reasonable charge through Patient Liability, Nursing Facility engaged in balance-billing. Thus, the Department did not err in so concluding.

## C. Remand

Lastly, we address Nursing Facility's request for a remand to the Department to analyze the validity of the MA Bulletin. Nursing Facility argues the Department abused its discretion when it did not issue any findings or conclusions as to its validity challenge. Again, we disagree.

As explained above, the Disputed Billing Practice is not permitted by federal law, the State Plan or the Provider Agreement. In the administrative appeal, Nursing Facility bore the burden of proof, not the Department. Nursing Facility failed to meet its burden. Accordingly, the alleged status of the MA Bulletin as an unpromulgated regulation makes no difference to the outcome here. Because the Department did not need to assess the MA Bulletin to decide Nursing Facility's appeal, a remand to address its validity is unnecessary.

---

[14] Nursing Facility repeatedly asserts it "never sought to hold a dual eligible resident 'legally liable' for any Medicare cost-sharing amounts." Pet'r's Br. at 8, 16. It cites no legal authority for imposing subjective intent as an element of balance-billing.

25

## IV. Conclusion

For the foregoing reasons, we affirm the Department's order denying Nursing Facility's appeal.

_____
ROBERT SIMPSON, Judge

Judge McCullough dissents.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mulberry Square Elder Care            :
and Rehabilitation Center,            :
                   Petitioner      :    No. 371 C.D. 2017
                                    :
          v.                                :
                                      :
Department of Human Services,         :
                   Respondent     :

## **O R D E R**

AND NOW, this  26th day of July, 2018, the order of the Department of Human Services is AFFIRMED.

 

 

                                      _____
                                        ROBERT SIMPSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mulberry Square Elder Care   :
and Rehabilitation Center,   :
             Petitioner   :
  :
       v.   :   No. 371 C.D. 2017
  :   ARGUED: April 11, 2018
  :
Department of Human Services,   :
             Respondent   :


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
                HONORABLE ROBERT SIMPSON, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE ELLEN CEISLER, Judge


CONCURRING OPINION
BY JUDGE CEISLER                             FILED: July 26, 2018

I agree that the majority has accurately applied the Medicaid amendment through Section 4714 of the Balanced Budget Act of 1997, regarding state liability for Medicare cost-sharing (1997 Amendment), 42 U.S.C. §1396a(n), that clarified and limited the legal liability of a qualified Medicare beneficiary such that Mulberry Square Elder Care and Rehabilitation Center (Nursing Facility) could not recover part of the otherwise unrecoverable Part B copay by utilizing its residents' Patient Liability amounts. As such, I concur in the result reached by this Court.

I write separately, however, because I respectfully disagree with the majority's view that the Secretary of the Department of Human Services (Department's) reliance on the Medical Assistance Bulletin ("MA Bulletin") as

Pennsylvania's State Plan is the appropriate method for enforcing the 1997 Amendment in the Commonwealth.

Pursuant to Section 102 of the Commonwealth Documents Law[1], 45 P.S. §1102, an agency may set forth guidelines in statements of policy. However, as pointed out by Judge Simpson in his majority Opinion, agency **regulations** must be promulgated pursuant to the notice and comment procedures contained in the Commonwealth Documents Law in order to have the force and effect of law. *Hillcrest Home, Inc.*, *v. Dep't of Pub. Welfare*, 553 A.2d 1037 (Pa. Cmwlth. 1989).

As the majority points out, and the parties here agree, the Regulation, 55 Pa. Code §1187.102, pertains primarily to Part A services. That Regulation sets a cap on payment for Part A (inpatient facility care). With regard to Part B services (physician/therapy services), the Regulation provides that Medicare benefits shall be exhausted before any payment is made under the MA Program, but the Regulation does not set a cap on those Part B payments. As the majority further points out, "[t]he Regulation is merely silent [on the cap for Part B payments]." Maj. Op. at 17. That silence does not give a green light to implement a regulation through policy-making.

As just stated, compliance with the Commonwealth Documents Law is required where an agency promulgates a regulation. *Naylor v. Dep't of Pub. Welfare*, 54 A.3d 429, 433–34, 436 (Pa. Cmwlth. 2012), *aff'd without op.*, 76 A.3d 536 (Pa. 2013); *Borough of Bedford v. Dep't of Envt'l. Prot.*, 972 A.2d 53, 61–63 (Pa. Cmwlth. 2009) (*en banc*). The distinction between statements of policy and regulations is that a general statement of policy merely announces the course which the agency intends to follow in future adjudications. *Pa. Human Relations Comm'n*

---

[1] Act of July 31, 1968, P.L. 769, as amended, 45 P.S. §1102.

*v. Norristown Area Sch. Dist.,* 374 A.2d 671, 679 (Pa. 1977). Agency action constitutes a regulation where it is denominated by the agency as a regulation or, *even if not so labeled,* where it purports to establish a "binding norm." *Northwestern Youth Servs. Inc. v. Dep't. of Pub. Welfare*, 66 A.3d 301 (Pa. 2013).[2]

The MA Bulletin (as it pertains to Part B services) contains language that is mandatory and restrictive, which is indicative of a regulation. For example, the Discussion Section C of the MA Bulletin (pertaining to the MA per diem rate) states that:

> [DHS's] payment of cost-sharing amounts for . . . Part B services provided to MA residents on or after January 1, 1998 *is governed by 55 Pa. Code §1187.102 and other applicable billing and payment regulations.* Effective January 1, 1998, the MA per diem rate or fee is the *maximum payment that may be received by the facility for services provided to both* . . . MA residents and non . . . MA residents. (Emphasis added.)

Reproduced Record (R.R.) at 669a.

The Procedure Section C of the MA Bulletin (pertaining to cost-sharing payments) states that: "[t]he invoices will be paid insofar as the amounts paid by Medicare do not exceed the MA per diem rate or fee, *up to the maximum* cost-sharing amount." R.R. at 672a.

---

[2] In *Northwestern Youth Services*, the entities furnishing out-of-home child welfare and/or juvenile justice services (NWS) filed suit against the Department of Public Welfare (DPW), predecessor of the Department, for changes to DPW's practices and policies in determining reimbursement for child welfare placement services. The original reimbursement scheme was reflected in the Pennsylvania Code and published in DPW regulations. Thereafter, DPW made unilateral changes to reimbursement via administrative bulletin, which were not vetted through the formal procedures for promulgation of valid legislative regulations. The Pennsylvania Supreme Court held that where DPW issues binding rules, which if not obeyed would deprive regulated entities of reimbursement, any such mandatory requirements are in the nature of legislative enactments and must comply with the formal notice, comment and review procedures set forth in the Commonwealth Documents Law. *Northwestern Youth Services,* 66 A.3d at 307.

Here, any limitation placed upon the applicable MA fee for Part B services that are provided to a MA nursing home resident is a binding norm regulation, just as Section 1187.102 is a binding norm Regulation as it pertains to Part A services. 55 Pa. Code §1187.102; *Northwestern Youth Services.*

The prospective incorporation of future changes into a regulation is not necessarily a problem so long as it is clear that what may be incorporated in the future is adopted in accordance with rulemaking procedures. Revisions to policy statements, however, are not subject to such procedures. The majority correctly applied the principles of the 1997 Amendment to Part B. However, the manner in which the Department achieved the application of Part B, through a Department Bulletin, appears to skirt the regulatory review procedures set forth in the Commonwealth Documents Law, 45 P.S. §1102; *Hillcrest Home, Inc.*

The Department did not take the additional steps required by the Commonwealth Documents Law, including formal notice, comment, and review procedures to amend 55 Pa. Code §1187.102 to restrict the ability of regulated nursing facilities to recoup outstanding Part B co-payment fees. Instead, the Department imposed this limit on nursing facilities through the MA Bulletin, which is merely a statement of policy.

While it is clear that the Department properly implemented the federal regulations pertaining to state liability for Part A Medicare cost-sharing, it did not do so as it relates to the changes in Part B. My concern is the slippery slope that can be created by disregarding the procedural guidelines and protections inherent in the Commonwealth Documents Law. For this reason, while I concur in the result that the Nursing Facility cannot recover part of the otherwise unrecoverable Part B copay

by utilizing its residents' Patient Liability amounts, I must respectfully disagree with how the result was achieved.

 

 

_____

ELLEN CEISLER, Judge

Judge McCullough joins in this concurring opinion.