IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lutheran Home at Kane and Siemon's    :
Lakeview Manor Estate,                :
               Petitioners  :
                                   :
               v.                   :
                                   :
Department of Human Services,         :    No. 303 C.D. 2023
               Respondent     :    Argued: May 7, 2024


BEFORE:   HONORABLE ANNE E. COVEY, Judge
               HONORABLE ELLEN CEISLER, Judge
               HONORABLE MATTHEW S. WOLF, Judge

OPINION BY
JUDGE COVEY                           FILED:  June 4, 2024

        Lutheran Home at Kane (Lutheran Home) and Siemon's Lakeview Manor Estate (Siemons) (collectively, Providers) petition this Court for review of the Department of Human Services' (Department), Bureau of Hearings and Appeals' (BHA), March 1, 2023 order adopting the Administrative Law Judge's (ALJ) adjudication and recommendation (Recommendation) that denied their appeals. Providers essentially present three issues for this Court's review: (1) whether the BHA erred by concluding that the Department's interpretation of Section 1187.91(1)(iv) of the Department's Regulations (Section 1187.91(1)(iv)), 55 Pa. Code § 1187.91(1)(iv), was entitled to deference; (2) whether the BHA's order violated due process by changing an evidentiary ruling made at the hearing without prior notice; and (3) whether the BHA's order should be reversed and remanded for final computations of amounts due to Providers consistent with their agreements and

without adjustments to the Budget Adjustment Factor (BAF).[1]  After review, this Court affirms.

## Background[2]

The Medical Assistance (MA) Program is a health care payment program for the poor, elderly, and disabled, which is jointly funded by the federal government and the states.  *See* Chapter 7, subchapter XIX of the Social Security Act (Act), 42 U.S.C. §§ 1396-1396v; *see also* Article 4, subsection (f) of the Human Services Code (Code),[3] 62 P.S. §§ 441.1-449.2.  To qualify for federal funds, the states must satisfy certain requirements under federal law relating to the state plans for MA.  *See generally* Section 1902 of the Act, 42 U.S.C. § 1396a.  A participating state must submit a state plan for MA and any proposed plan amendment to the federal Secretary of Health and Human Services (HHS) through the Centers for Medicare and Medicaid Services (CMS).[4]  *See Christ the King Manor, Inc. v. Sec'y*

---

[1] Providers set forth six issues in their Statement of Questions Involved: (1) whether Section 1187.91(1)(iv) has only one reasonable construction, such that the Department's interpretation is plainly erroneous and deference is not required; (2) whether Providers met their burden of proof; (3) whether substantial evidence supported the BHA's order; (4) whether the BHA's legal conclusions were inconsistent with its factual findings; (5) whether the BHA's order violated due process by changing an evidentiary ruling at the hearing without prior notice; and (6) whether the BHA's order should be reversed and remanded for final computations of amounts due to Providers consistent with their agreements and without adjustments to the BAF.  *See* Providers' Br. at 4.  Because Providers arguments do not clearly correspond with the issues as set forth in their Statement of Questions Involved, and the second, third, and fourth issues are subsumed in the first, this Court restated Providers' issues for continuity of discussion and analysis.

[2] The facts are as stipulated in the parties' July 13, 2018 Stipulation of Facts, *see* Reproduced Record (R.R.) at 153a-162a, and July 16, 2018 Second Stipulation of Facts.  *See* R.R. at 163a-167a.

[3] Formerly the Public Welfare Code, Act of June 13, 1967, P.L. 31, *as amended*, added by Section 5 of the Act of July 31, 1968, P.L. 904; *see also* Section 1101.11(b) of the Department's Regulations, 55 Pa. Code § 1101.11(b).

[4] Section 430.10 of the HHS's Regulations describes:

2

*U.S. Dep't of Health & Hum. Servs.*, 673 F. App'x 164 (3d Cir. 2016) (*Christ the King II*). Each state plan "must detail the state's program and show its compliance with the [] Act." *Christ the King II*, 673 F. App'x at 167; *see also* Section 1902 of the Act, 42 U.S.C. § 1396a(a); Section 430.10 of the HHS's Regulations, 42 C.F.R. § 430.10; *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Hum. Servs.*, 730 F.3d 291 (3d Cir. 2013) (*Christ the King I*).

> In particular,
>
> [t]he Act sets out procedures and criteria for rates to pay participating providers. 42 U.S.C. § 1396a(a)(30)(A) [(Section 30(A))]. Section 30(A) requires a state to "assure that payments to providers produce four outcomes: (1) 'efficiency,' (2) 'economy,' (3) 'quality of care,' and (4) adequate access to providers by Medicaid beneficiaries." P[*a.*] *Pharmacists Ass'n* [*v. Houston*], 283 F.3d [531,] 537 [(3d Cir. 2002)] (quoting [Section (30)(A)]. CMS is required to review state plans and proposed plan amendments to ensure compliance with [Section] 30(A). *Christ the King I*, 730 F.3d at 297.

*Christ the King II*, 673 F. App'x at 167.

The Department is the agency authorized to administer the MA Program in the Commonwealth and to take all necessary measures to obtain the federal participating funds, including issuance of regulations and submission of Pennsylvania's MA state plan (State Plan) for CMS approval. *See* Section 201(1)

---

> The [s]tate plan is a comprehensive written statement submitted by the agency describing the nature and scope of its [MA] program and giving assurance that it will be administered in conformity with the specific requirements of [T]itle XIX [of the Act], the regulations in this Chapter IV, and other applicable official issuances of [HHS]. The [s]tate plan contains all information necessary for CMS to determine whether the plan can be approved to serve as a basis for [f]ederal financial participation [] in the [s]tate program.

42 C.F.R. § 430.10.

and (2) of the Code, 62 P.S. § 201(1)-(2); *see also Mulberry Square Elder Care & Rehab. Ctr. v. Dep't of Hum. Servs.*, 191 A.3d 952 (Pa. Cmwlth. 2018).

Relevant here, the MA Program includes payment for nursing facility services. Providers are long-term care skilled nursing facilities certified to provide care to MA-participating residents. Since January 1996, the MA Program pays participating nursing facilities for MA services through an annual prospective payment rate often referred to as the case-mix rate. *See* MA Manual, Chapter 1187 (Nursing Facility Services) (Chapter 1187), subchapter G (Rate Setting), in the Department's Regulations, 55 Pa. Code §§ 1187.91-1187.98. The annual case-mix rate is effective from July 1 of one year through June 30 of the next year, with quarterly adjustments for resident acuity (i.e., residents' level of sickness). *See id.*

The calculation of the case-mix rate has three stages. At the first stage (First Stage), the Department's Office of Long Term Living audits an MA-participating nursing facility's cost report (MA-11)[5] to verify the provider's

---

[5] Section 1187.71 of the Department's Regulations provides, in relevant part:

> (a) A nursing facility shall report costs to the MA Program by filing an acceptable MA-11 with the Department. . . .
>
> . . . .
>
> (b) The MA-11 shall identify allowable direct, indirect, ancillary, labor[,] and related party costs for the nursing facility and residential or other facility.
>
> (c) The MA-11 shall identify costs of services, movable property[,] and supplies furnished to the nursing facility by a related party and the rental of the nursing facility from a related party.
>
> (d) The MA-11 shall be based on accrual basis financial and statistical records maintained by the nursing facility. The cost information contained in the cost report and in the nursing facility's records shall be current, accurate and in sufficient detail to support the reported costs.

allowable costs for the fiscal year.[6]  *See* Sections 1187.22(12), 1187.71, 1187.73, and 1187.77 of the Department's Regulations, 55 Pa. Code §§ 1187.22(12), 1187.71, 1187.73, 1187.77.  An MA-participating nursing facility reports its costs for a 12-month fiscal year that ends either on June 30 or December 31, as designated by the nursing facility.[7] *See* 55 Pa. Code § 1187.73.  Once the Department audits the cost report, it issues an audit report to the nursing facility which both identifies any adjustments to, and disallowances or reported costs, and states the allowable costs.[8]  *See* 55 Pa. Code § 1187.77.  The Department places the nursing facility's audited allowable costs in the Nursing Information System (NIS) database to be used in later stages of the rate calculation.  *See* Section 1187.91(1)(i) of the Department's Regulations, 55 Pa. Code § 1187.91(1)(i).

The second stage (Second Stage) of the rate-setting process is the establishment of peer group prices in three net operating cost categories: resident

---

(e) An acceptable cost report is one that meets the following requirements:

. . . .

(5) The MA-11 is filed with the Department within the time limits in [Sections] 1187.73, 1187.75 and 1187.76[, 55 Pa. Code §§ 1187.73, 1187.75, 1187.76] (relating to annual reporting; final reporting; and reporting for new nursing facilities).

55 Pa. Code § 1187.71.

[6] Section 1187.2 of the Department's Regulations defines *allowable costs* as "costs . . . which are necessary and reasonable for an efficiently and economically operated nursing facility to provide services to MA residents."  55 Pa. Code § 1187.2.  Subchapter E of Chapter 1187 of the Department's Regulations sets forth the principles for determining nursing facilities' allowable costs.  *See* 55 Pa. Code §§ 1187.51-1187.61.

[7] MA-participating nursing facilities must submit their cost reports to the Department "within 120 days following the June 30 or December 31 close of [their] fiscal year."  55 Pa. Code § 1187.73(b).  The Department must audit the cost reports within one year of accepting them.  *See* 55 Pa. Code § 1187.77(d).

[8] Subchapter F of Chapter 1187 of the Department's Regulations specifies nursing facilities' cost reporting and the Department's audit requirements.  *See* 55 Pa. Code §§ 1187.71-1187.80.

care costs, other resident-related costs, and administrative costs. *See* Sections 1187.94 and 1187.95 of the Department's Regulations, 55 Pa. Code §§ 1187.94-1187.95. The peer group prices serve to limit the individual nursing facility provider payment rate around the costs of the median nursing facility within a group of nursing facilities of similar size and geographic location, or similar resident population. *See id.* To establish peer group prices, the MA Program uses each nursing facility's inflated allowable costs in the three most recent audited cost reports as found in the NIS database. *See id.*

The third stage (Third Stage) of the rate setting process is the calculation of each nursing facility's individualized case-mix rate. *See* Section 1187.96 of the Department's Regulations, 55 Pa. Code § 1187.96. To calculate the individualized case-mix rate, the Department takes the average of a nursing facility's inflated allowable costs and applies any peer group price limitations. *See id.* In addition, the Department calculates an amount for reimbursement of capital costs based on a facility appraisal. *See id.*

A nursing facility's individualized case-mix rate is adjusted quarterly by a case-mix index to allow for changes in its residents' acuity level. *See* Sections 1187.91(1)(v) and 1187.96(a)(5) of the Department's Regulations, 55 Pa. Code §§ 1187.91(1)(v) and 1187.96(a)(5). At the end of each quarterly adjustment, the Department determines a Budget Adjustment Factor (BAF). *See* Section 1187.96(e)(iv) of the Department's Regulations, 55 Pa. Code § 1187.96(e)(iv).

To inflate costs for peer group price setting (Second Stage) and for setting the individualized nursing facility case-mix rate (Third Stage), the Department calculates an inflation factor (Inflation Factor) pursuant to Section 1187.91 of the Department's Regulations, which states, in relevant part:

> The Department will set rates for the case-mix payment
> system based on the following data:

6

(1) *Net operating costs*.

> (i) The net operating prices will be established based on the following:

> > (A) Audited nursing facility costs for the [three] most recent years available in the NIS database adjusted for inflation. This database includes audited MA-11 cost reports that are issued by the Department on or before March 31 of each July 1 price setting period.

> > . . . .

> > (iv) Prior to price setting, **cost report information will be indexed forward to the 6th month of the 12-month period for which the prices are set**. **The index used is the 1st Quarter issue of the CMS Nursing Home Without Capital Market Basket Index** [**(Index)**].[9]

55 Pa. Code § 1187.91 (emphasis added).

## Facts

By February 6, 2008 notice, the Department issued Lutheran Home's final and quarterly case-mix rate notice for July 1, 2007 to June 30, 2008 (Year 13) pursuant to Section 1187 of the Department's Regulations, applying a .93194 BAF as the Stage Three rate setting calculation, as follows:

---

[9] The Index assigns an index to each quarter of a given calendar year that represents a relative measure of the costs of goods and services in certain categories at a point in time. In a single issue of the Index, the federal government includes both historical indices for calendar quarters that have occurred, and forecasted indices for calendar quarters that have not yet occurred. The federal government issues the Index on a quarterly basis to update historical data and to update the forecasts. By comparing the indices for two different quarters, one can determine how much, more or less, it would cost to purchase the same mix of goods and services from the first point in time to the later point in time. The Inflation Factor is derived from the comparison of the indices from two different quarters.

| Effective Date | Final Rate |
|---|---|
| 07/01/07 | $160.10 |
| 10/01/07 | $167.99 |
| 01/01/08 | $170.36 |
| 04/01/08 | $167.99 |

*See* Reproduced Record (R.R.) at 73a-81a.

That same day, the Department issued Siemons's final and quarterly case-mix rate notice for Year 13, applying a .93194 BAF as the Stage Three rate setting calculation, as follows:

| Effective Date | Final Rate |
|---|---|
| 07/01/07 | $166.34 |
| 10/01/07 | $169.62 |
| 01/01/08 | $171.26 |
| 04/01/08 | $167.98 |

*See* R.R. at 107a.

On March 10, 2008, in response to the Department's notices, Providers and numerous other affected nursing facilities filed Requests for Hearing raising three issues: (1) whether the Department's audit adjustments to Providers' costs were improper; (2) whether the BAF used to calculate the payment rates complied with federal requirements; and (3) whether the Department properly inflated the audited allowable costs. *See* R.R. at 61a-81a, 96a-109a. The nursing facilities fully litigated and, consequently, no longer dispute the first two issues.[10] Therefore, the only issue remaining is whether the Department properly inflated costs from the end point of the cost report year to the mid-point of the rate year or whether the

---

[10] In *Manor at St. Luke Village v. Department of Public Welfare*, 72 A.3d 308 (Pa. Cmwlth. 2013), other nursing facilities fully litigated to final disposition whether they may challenge audit report findings within the context of a rate and, consequently, no longer dispute that issue. Nursing facilities, including Siemon's, also fully litigated and no longer challenge whether the BAF, including its implementation process, complied with federal law. *See Christ the King Manor v. Sebelius*, 2012 WL 3027543 (M.D. Pa. 2012), *aff'd in part*, *rev'd in part sub nom.*, *Christ the King Manor v. Sec'y U.S. Dep't of Health & Hum. Servs.*, 730 F.3d 291 (3d Cir. 2013); *Christ the King Manor v. Burwell*, 163 F. Supp. 3d 123 (M.D. Pa. 2016), *aff'd sub nom.*, *Christ the King Manor v. Sec'y U.S. Dep't of Health & Hum. Servs.*, 673 F. App'x 164 (3d Cir. 2016).

Department should have inflated costs from the mid-point of the cost report year to the mid-point of the rate year. *See* R.R. at 402a (Providers' counsel acknowledged: "What we're here to do is to determine . . . whether the interpretation of the [I]nflation [F]actor from end[]point to mid[-]point is proper or whether it should be calculated mid[-]point to mid[-]point.").

The Department interpreted Section 1187.91(1)(iv) to mean that the Department must compare: (1) the Index assigned to the last quarter of the cost report year (i.e., the end point of the cost report year); to (2) the Index for the quarter ending on December 31 (which includes the 6th month of the rate year (i.e., the mid-point of the rate year)). *See* R.R. at 73a, 107a. The Department referred to its three most recent cost reports to demonstrate its application of the Inflation Factor for Year 13 as follows:

> For the June 30, 2003 cost report, the Index for the last quarter of the cost report year (i.e., quarter ending June 30) was 1.439 and the Index for the quarter ending December 31 (i.e., mid-point of rate year) was 1.661, making the percentage increase between those indices (rate of inflation) 15.43%, resulting in an Inflation [Factor] of 1.1543.
>
> For the June 30, 2004 cost report, the Index for the last quarter of the cost report year was 1.478 and the Index for the quarter ending December 31 was 1.661, making the rate of inflation 12.38%, resulting in an Inflation [Factor] of 1.1238.
>
> For the June 30, 2005 cost report, the Index for the last quarter of the cost report year was 1.525 and the Index for the quarter ending December 31 was 1.661, making the rate of inflation 8.92%, resulting in an Inflation [Factor] of 1.0892.

*See* Stipulation of Facts (Stipulations) ¶ 39 (R.R. at 161a); *see also* 38 Pa. Bull. 670 (2008).

Providers and the other affected nursing facilities argued that the Department should inflate the audited allowable costs for purposes of peer group price setting and for individual facility rate setting from the mid-point of the cost report year to the mid-point of the rate year.[11] Providers illustrated their position by applying the Inflation Factor for the same rate years the Department did, based on mid-point of the cost report year to the mid-point of the rate year as follows:

> For cost report year ending June 30, 2003, the Index for the mid-point of the cost report year mid-point was 1.421 and the Index for the mid-point of the rate year was 1.661, making the percentage increase between indices (i.e., rate of inflation) 16.89%, resulting in an Inflation Factor of 1.1689.
>
> For cost report year ending December 31, 2003, the Index for the cost report year mid-point was 1.439 and the Index for the rate year mid-point was 1.661, making the rate of inflation 15.43%, resulting in an Inflation Factor of 1.1543.
>
> For cost report year ending June 30, 2004, the Index for the cost report year mid-point was 1.457 and the Index for the rate year mid-point was 1.661, making the rate of inflation 14.00%, resulting in an Inflation Factor of 1.14.
>
> For cost report year ending December 31, 2004, the Index for the cost report year mid-point was 1.478 and the Index for the rate year mid-point was 1.661, making the rate of inflation 12.38%, resulting in an Inflation Factor of 1.1238.
>
> For cost report year ending June 30, 2005, the Index for the cost report year mid-point was 1.501 and the Index for the rate year mid-point was 1.661, making the rate of

---

[11] Providers do not dispute that the Department properly calculated the capital cost reimbursement component in accordance with Section 1187.96 of the Department's Regulations, or that the Department made proper case-mix index adjustments to Providers' facility-specific rates in accordance with Sections 1187.91(1)(v) and 1187.96(a)(5) of the Department's Regulations.

10

inflation 10.66%, resulting in an Inflation Factor of 1.1066.

For cost report year ending December 31, 2005, the Index for the cost report year mid-point was 1.525 and the Index for the rate year mid-point was 1.661, making the rate of inflation 8.92%, resulting in an Inflation Factor of 1.0892.

*See* Stipulations ¶ 42 (R.R. at 162a).

On July 13, 2018, the parties agreed to the Stipulations to expedite the hearing process.[12] *See* R.R. at 153a-162a. Therein, the parties agreed that if the Department's interpretation and application of Section 1187.91(1)(iv) is correct, then the Department properly calculated and applied the Inflation Factor. *See* Stipulations ¶ 40 (R.R. at 161a).

The ALJ conducted hearings on July 17, 2018, at which Providers and the other affected nursing facilities presented the testimony and reports of Medicare/Medicaid reimbursement experts Thomas T. Ziegler (Ziegler), *see* R.R. at 169a-187a, 299a-333a, and Leon E. LeBreton (LeBreton), *see* R.R. at 188a-201a, 333a-362a. Ziegler is an expert in Medicaid and Medicare reimbursement. He opined within a reasonable degree of professional certainty that, using the Index prescribed by Section 1187.91(1)(iv), the Department should calculate the Inflation Factor from mid-point to mid-point because,

[b]y not doing that[,] we are forfeiting that amount of inflation for that year, that amount of inflation for the [June 20]04 fiscal year and that amount of inflation for the [June 20]05 fiscal year. And, thereby, because these are averaged, each one of these years was one[-]third of the eventual rate because we're using three audit reports.

So we're basically losing six months of inflation over the entire rate. And it - it's just nonsensical that when we're

---

[12] On July 16, 2018, the parties drafted a Second Stipulation of Facts, *see* R.R. at 163a-167a; however, the parties agreed that the matters addressed therein were not ripe for the hearing. *See* ALJ Recommendation at 5; *see also* R.R. at 400a-404a.

going through the mid - we're inflating to a mid[-]point, that we aren't starting with the mid[-]point. We're starting at the end of the year for no apparent reason. It makes zero sense to calculate it in that fashion.

R.R. at 317a; *see also* R.R. at 330a-331a. Ziegler added that the Department's end point to mid-point methodology is only accurate to capture inflation on "the last day of the year. But it's not accurate for the way that we're using it. We're inflating costs that occurred over an entire year by the end date of that year which eliminates the inflation that occurs during the year." R.R. at 318a. Ziegler concluded that the Department's process is "not reasonable[,]" R.R. at 319a; *see also* R.R. at 320a, and "it's inaccurate." R.R. at 331a.

LeBreton is a certified public accountant (CPA) and expert in Medicaid and Medicare reimbursement. He opined within a reasonable degree of professional certainty that the Department should inflate costs from mid-point to mid-point (i.e., having consistent starting and ending points) to capture a full 12 months of inflation. *See* R.R. at 355a-357a. LeBreton declared "[t]hat the Department's methodologies are unreasonable, are grossly inaccurate[,] and contrary to its own [R]egulations." R.R. at 346a. LeBreton described:

> Costs inflate over time, costs are incurred over time. So[,] for example, using an easy 12 calendar year, that's easier for me to describe, at [December 31] of the year on that particular day there's going to be costs that are incurred in providing care.
>
> On that same day there's also essentially an average of all the costs for the full year. But those costs are not incurred at that same rate throughout the year. They're lower at the beginning of the year than they are at the end of the year.
>
> So[,] by inflating or indexing forward from the end of the year you are eliminating or omitting the inflation that occurred throughout the year. So, by not using a mid[-]point, you're eliminating six months of inflation.

12

R.R. at 347a; *see also* R.R. at 354a, 358a. He further explained that the Department's methodology is inconsistent with other Department Regulations, such as Section 1187.111(c) of the Department's Regulations, where the Department uses 12-month calculations to determine disproportionate share payments. *See* R.R. at 347a-350a, 358a-359a.

LeBreton also detailed that Medicare principles supplement Section 1187.91 of the Department's Regulations, such that the federal government inflates its "Medicare . . . rates every year from the mid[-]point of the year to the next mid[-]point of the year. So[,] Medicare uses a mid[-]point to mid[-]point methodology for purposes of its rate inflation[,]" R.R. at 352a, which he declared accurate and reasonable. *See* R.R. at 353a, 355a-356a.

The Department presented fact witness Annette Laracuente (Laracuente), a CPA who testified that the Department hired her firm, Myers & Stauffer, LLC, in 1992 to complete the development of the software packages and databases to hold the information necessary to calculate case-mix rates, and to help draft the attendant Regulations and State Plan amendment. *See* R.R. at 370a-371a. She recalled that the Department has used the case-mix rate system since Section 1187 of the Department's Regulations was promulgated in 1996. *See* R.R. at 372a. Laracuente stated that the Department rejected a comment received in response to one of its proposed Regulations.[13] *See* R.R. at 372a-374a. To the best of Laracuente's knowledge, CMS has not challenged the Department's inflation calculation methodology nor directed the Department to change it. *See* R.R. at 389a, 404a-405a.

---

[13] Upon Providers' objection, the ALJ limited Laracuente's testimony to the fact that a comment to a proposed Regulation was rejected, and struck all other related testimony. *See* R.R. at 372a-389a.

13

The ALJ found that Ziegler and LeBreton each "provided uncontradicted[,] credible testimony of his opinion that the Department's end[]point to mid-point methodology for indexing forward and inflating allowable costs was unreasonable and inaccurate." ALJ Recommendation at 9, Findings of Fact (FOF) 30-31. The ALJ also found Laracuente's testimony regarding the Department's methodology credible. *See id*., FOF 32. In addition, the ALJ adopted and incorporated the parties' Stipulations.

On March 1, 2023, the ALJ issued the Recommendation denying Providers' appeals, concluding that Providers "did not meet their burden of proof by the preponderance of the evidence demonstrating that the Department improperly inflated costs using an end point to mid-point case-mix rate setting payment system . . . ." ALJ Recommendation at 38. The ALJ reasoned: (1) the Department was authorized to and did promulgate regulations governing the allowable costs and how those costs would be inflated; (2) the Department's end point to mid-point inflation process for case-mix rate calculations is a holdover from the prior cost-based system applied since the case-mix rate system's inception in 1996; and (3) Providers' experts' testimony that their preferred methodology is more accurate, reasonable, and in line with CMS's methodology did not render the Department's methodology unreasonable, inaccurate, inconsistent with the Regulation, arbitrary, or an abuse of discretion, or exercised in bad faith. That same day, the BHA adopted the ALJ's Recommendation in its entirety. On March 31, 2023, Providers appealed to this Court.[14]

---

[14]     [This Court's] review is limited to whether the "adjudicatio[n] [is] in accordance with the law as well as agency regulations or procedures, whether any constitutional rights were violated, and whether the findings of fact are supported by substantial evidence." *Univ. of Pittsburgh, Sys. of Higher Educ., W. Psychiatric Inst. &*

On April 28, 2023, the following nursing facilities, which were parties to this action before the BHA, filed Notices to Intervene and adopted Providers' arguments: Robert Zabady, Successor in Interest to the Ellen Memorial Health Care Center (now known as (n/k/a) Ellen Memorial, LLC); Darrell Cammack, Successor in Interest to the Rheems Nursing & Rehabilitation Center (n/k/a Elizabethtown Opco, LLC a/k/a Elizabethtown Nursing and Rehabilitation Center); and Darrell Cammack, Successor in Interest to the Susquehanna Valley Nursing and Rehabilitation Center (n/k/a Susquehanna Rehabilitation & Wellness Center) (collectively, Intervenors).

## Discussion

Initially,

> [p]articipation in a state MA [P]rogram is voluntary but, to receive federal money to fund the program, its approved plan must meet all requirements of the federal statute and implementing regulations. Although states have a certain amount of discretion in formulating the terms of their MA [P]rograms, this discretion is not unlimited, because the state must fully comply with the federal statutes and regulations governing the MA [P]rogram. Federal law requires that states applying for MA must comply with the provisions of Section 1902 of the . . . Act [], 42 U.S.C. § 1396a.

---

*Clinic v. Dep't of Pub. Welfare*, . . . 616 A.2d 149, 152 n.3 ([Pa. Cmwlth.] 1992); *see* [*also*] *Schell v. Dep't of Pub. Welfare*, 80 A.3d 844 (Pa. Cmwlth. 2013).

*Mulberry Square Elder Care*, 191 A.3d at 960 n.6. Whether a party has "satisfied the evidentiary standard necessary to meet its burden of proof is a question of law." *P.L. v. Dep't of Hum. Servs.*, 236 A.3d 1208, 1211 n.3 (Pa. Cmwlth. 2020). "Regulatory interpretation is [also] a question of law, and therefore, the standard of review is *de novo*[.]" *Dep't of Env't Prot. v. Clearfield Cnty.*, 283 A.3d 1275, 1283 (Pa. Cmwlth. 2022). "Although the standard of review is *de novo*, an agency's interpretation is entitled to deference by the courts[.]" *Id.*

15

*Eastwood Nursing & Rehab. Ctr. v. Dep't of Pub. Welfare*, 910 A.2d 134, 149 (Pa. Cmwlth. 2006) (citations omitted).

> [S]ection [1902(a)(13)(A) of the Act] requires, in pertinent part, a state agency to provide a public process for, *inter alia*, the determination of rates of payment under a state plan for nursing facilities under which: (1) the "proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published"; [sic] (2) interested parties and "[s]tate residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications"; [sic] and (3) "final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published." 42 U.S.C. § 1396a(a)(13)(A).

*John XXIII Home v. Dep't of Pub. Welfare*, 994 A.2d 636, 641 n.3 (Pa. Cmwlth. 2010).

In accordance with Section 1902(a)(13)(A) of the Act, the General Assembly in

> [t]he Code vests the Department "with responsibility for administration of the [MA] [P]rogram . . . and for 'establish[ing] rules, regulations[,] and standards . . . as to eligibility for assistance and as to its nature and extent.'"[15] *Dep't of Pub. Welfare v. Devereux Hosp. Tex. Treatment Network (K.C.)*, . . . 855 A.2d 842, 846 ([Pa.] 2004) (quoting Section 403(b) of the Code, 62 P.S. § 403(b)). Pursuant to its authority, the Department enacts regulations and policies to ensure the MA Program implements the State Plan and is consistent with federal law.

*Mulberry Square Elder Care*, 191 A.3d at 963.

---

[15] "Commonwealth agencies have no inherent power to make law or otherwise bind the public or regulated entities. Rather, an administrative agency may do so only in the fashion authorized by the General Assembly[.]" *Marcellus Shale Coal. v. Dep't of Env't Prot.*, 292 A.3d 921, 927 (Pa. 2023) (quoting *Nw. Youth Servs., Inc. v. Dep't of Pub. Welfare*, 66 A.3d 301, 310 (Pa. 2013)).

"[W]hen promulgating a regulation, [the Department] must comply with the requirements set forth in the Commonwealth Documents Law [(CDL)],[16] the Commonwealth Attorneys Act [(CAA)][,][17] and the Regulatory Review Act [(RRA)]."[18] *Germantown Cab Co. v. Phila. Parking Auth.*, 993 A.2d 933, 937 (Pa. Cmwlth. 2010), *aff'd*, 36 A.3d 105 (Pa. 2012) (footnotes omitted). The CDL, the CAA, and the RRA "comprise the core of Pennsylvania's scheme for notice-and-comment rulemaking by administrative agencies and legal and regulatory review by the Attorney General and the Independent Regulatory Review Commission[.]" *Marcellus Shale Coal. v. Dep't of Env't Prot.*, 292 A.3d 921, 927 (Pa. 2023) (quoting *Nw. Youth Servs., Inc. v. Dep't of Pub. Welfare*, 66 A.3d 301, 305 n.2 (Pa. 2013)). Consistent with Section 1902(a)(13)(A) of the Act, the purpose of Pennsylvania's regulatory review process "is to promote public participation in the promulgation of a regulation. To that end, an agency must invite, accept, review[,] and consider written comments from the public regarding the proposed regulation[.]" *Corman v. Acting Sec'y of Pa. Dep't of Health*, 267 A.3d 561, 572 (Pa. Cmwlth.), *aff'd*, 268 A.3d 1080 (Pa. 2021) (*Corman I*) (quoting *Germantown Cab Co.*, 993 A.2d at 937). "After [the Department] obtains the Attorney General's approval of the form and legality of the proposed regulation, [the Department] must deposit the text of the regulation with the Legislative Reference Bureau for publication in the *Pennsylvania Bulletin*." *Id*. "Regulations promulgated in accordance with these requirements have the force and effect of law."[19] *Id.*

---

[16] Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§ 1102-1602, and 45 Pa.C.S. §§ 501-907.

[17] Act of October 15, 1980, P.L. 950, *as amended*, 71 P.S. §§ 732-101 - 732-506.

[18] Act of June 25, 1982, P.L. 633, *as amended*, 71 P.S. §§ 745.1-745.14.

[19] In their brief, Providers declared:

> [Section 1187.91(1)(iv)] was adopted by a final form rulemaking published at 25 Pa.B. 4477-4505 (10/14/1995), without proposed

In addition, "'[p]roperly-enacted legislative rules enjoy a presumption of reasonableness and are accorded a particularly high measure of deference . . . .' *Nw. Youth Servs.*, 66 A.3d at 311 (citation omitted)." *Marcellus Shale Coal.*, 292 A.3d at 927. "[T]he level of such deference depends on how we categorize that interpretation." *Dep't of Env't Prot. v. Clearfield Cnty.*, 283 A.3d 1275, 1283 (Pa. Cmwlth. 2022). This Court has summarized:

> There are three categories of an agency's interpretation: (1) an agency's interpretation of its regulation interpreting an ambiguous statute, *i.e.*, *Chevron* deference; (2) an **agency's interpretation of its own regulation**, *i.e.*, ***Auer* deference**; and (3) an agency's interpretation of its non-legislative interpretive rules (guidance documents), *i.e.*, *Skidmore* deference. *See Corman* [*v. Acting Sec'y of Pa. Dep't of Health*], 266 A.3d [452,] 485 [(Pa. 2021) (*Corman II*)] (discussing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 . . . (1984), and *Auer v. Robbins*, 519 U.S. 452 . . . (1997)); *Nw. Youth Servs.*, 66 A.3d at 311-12 (discussing *Skidmore v. Swift & Co.*, 323 U.S. 134 . . . (1944)).

*Clearfield Cnty.*, 283 A.3d at 1284 n.16 (emphasis added). Under *Auer* deference,

> courts "**defer to an agency's interpretation *of its own regulation* . . . unless that interpretation is 'plainly**

---

rulemaking. That final form rulemaking references a prior proposed rulemaking at 23 Pa.B. 4975-4998 (10/16/1993) for a prior proposed version of case-mix payment system that was "never adopted or implemented because of continuing areas of disagreement" (25 Pa. B. at 4479). That prior proposed rulemaking did not include a regulation with the language now in [Section] 1187.91(1)(iv). Compare: proposed [Section 1185.81(1) of the Department's Regulations,] 55 Pa. Code § 1185.81(1) at 23 Pa.B. 4992 with [Section] 1187.91(1). The 1995 final form rulemaking contains no discussion of [Section 1187.91(1)(iv)] or of the changes made to that [R]egulation from the prior rulemaking.

Providers' Br. at 6-7. However, Providers did not advance any argument that Section 1187.91(1)(iv) was not properly promulgated, and they objected to the inclusion of any evidence regarding the promulgation process during the hearing. *See* R.R. at 372a-389a.

18

**erroneous or inconsistent with the regulation**.'"[20] *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 208 . . . (2011) (quoting *Auer* . . . , 519 U.S. [at] 461 . . . ([italic] emphasis added)); *accord Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 . . . (1945).[FN]59

> [FN]59 In *Kisor v. Wilkie*, [588] U.S. [558] . . . (2019),[21] the [United States (U.S.) Supreme] Court further qualified the limits of *Auer* deference, professing that it "is potent in its place, but cabined in its scope."

*Corman II*, 266 A.3d at 485 (bold emphasis added).

This Court has ruled:

> In determining whether an interpretation is [plainly or] "clearly erroneous," courts examine: "(1) whether [the

---

20 "These two factors address an agency's *interpretation* of a regulation." *Clearfield Cnty.*, 283 A.3d at 1284 n.17 (emphasis in original).

Relying on the Pennsylvania Supreme Court's test in *Tire Jockey Service, Inc. v. Department of Environmental Protection*, 915 A.2d 1165 (Pa. 2007), the Department asserts that its interpretation of Section 1187.91(1)(iv) is reasonable because it did not act in bad faith, manifestly or flagrantly abuse its discretion, nor arbitrarily execute its duties or functions. *See* Department Br. at 19-20. Indeed, in *Tire Jockey*, the Pennsylvania Supreme Court also held that

> when an agency adopts a regulation pursuant to its legislative rule-making power, as opposed to its interpretive rule-making power, it is valid and binding upon courts as a statute so long as it is (a) adopted within the agency's granted power, (b) issued pursuant to proper procedure, and (c) reasonable.

*Id*. at 1186.

The *Tire Jockey* Court added: "Regarding the reasonableness prong, 'appellate courts accord deference to agencies and reverse agency determinations only if they were made in bad faith or if they constituted a manifest or flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions.'" *Id*. (quoting *Rohrbaugh v. Pa. Pub. Util. Comm'n*, 727 A.2d 1080, 1085 (Pa. 1999)). However, in *Clearfield County*, the Pennsylvania Supreme Court clarified that these latter three *Tire Jockey* factors and its explanation of the reasonableness prong related thereto are intended to "resolv[e] a challenge to an agency's *promulgation* of the regulation[,]" rather than the type of *interpretation* at issue in the instant appeal. *Clearfield Cnty.*, 283 A.3d at 1284 n.17 (emphasis in original).

21 In *Kisor*, the U.S. Supreme Court granted certiorari to consider whether it should overrule *Auer* and *Seminole Rock*.

agency's] interpretation of the regulation is erroneous or inconsistent with the regulation[;] and (2) whether the regulation [as interpreted by [the agency]] is consistent with the statute under which it was promulgated." *Tire Jockey* [*Serv., Inc. v. Dep't of Env't Prot.*], 915 A.2d [1165,] 1186 [(Pa. 2007)] (citations omitted). In resolving whether the agency's regulatory interpretation is consistent with the statute, we must consider the purpose of the statute. *Id.* at 1188.

*Clearfield Cnty.*, 283 A.3d at 1284 (footnotes omitted).

> [**D**]**eference is likewise unwarranted when** there is reason to suspect that the agency's interpretation "does not reflect the agency's fair and considered judgment on the matter in question." *Auer*, [519 U.S.] at 462 . . . ; *see also, e.g.*, *Chase Bank* . . . . This might occur when the agency's interpretation conflicts with a prior interpretation, *see, e.g.*, *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 . . . (1994), or when it appears that **the interpretation is nothing more than a "convenient litigating position**," *Bowen v. Georgetown Univ. Hosp*[.], 488 U.S. 204, 213 . . . (1988), **or a** "'*post hoc* **rationalizatio**[n]' advanced by an agency seeking to defend past agency action against attack," *Auer*, [519 U.S.] at 462 . . . (quoting *Bowen*, [488 U.S.] at 212 . . . ; alteration in original).

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (emphasis added); *see also Malt Beverages Distribs. Ass'n v. Pa. Liquor Control Bd.*, 974 A.2d 1144 (Pa. 2009); *Seeton v. Pa. Game Comm'n*, 937 A.2d 1028 (Pa. 2007).

Pennsylvania courts only apply *Auer* deference to agencies' reasonable interpretations of *ambiguous* regulations. *See Crown Castle NG E. LLC v. Pa. Pub. Util. Comm'n*, 234 A.3d 665 (Pa. 2020); *Seeton*, 937 A.2d at 1037 ("[C]ourts' deference never comes into play when the statute is clear."); *Blue Pilot Energy, LLC v. Pa. Pub. Util. Comm'n*, 241 A.3d 1254, 1258 n.10 (Pa. Cmwlth. 2020) ("To the extent any of the statutes or regulations . . . on appeal are ambiguous, we will afford the appropriate level of deference . . . ."). "An ambiguity exists when language is subject to two or more reasonable interpretations and not merely because two

20

conflicting interpretations may be suggested." *Interstate Gas Supply, Inc. v. Pub. Util. Comm'n*, 298 A.3d 1181, 1188 (Pa. Cmwlth. 2023), *appeal granted*, (Pa. No. 292 MAL 2023, Mar. 5, 2024), 2024 WL 935767, (quoting *Tri-Cnty. Landfill, Inc. v. Pine Twp. Zoning Hearing Bd.*, 83 A.3d 488, 510 (Pa. Cmwlth. 2014)).

Providers argue that the BHA erred by concluding that the Department's interpretation of Section 1187.91(1)(iv) was entitled to deference. Specifically, Providers contend that the BHA erred as a matter of law by concluding that Providers did not meet their burden of proving that Section 1187.91(1)(iv) has only one reasonable construction and, thus, the Department's interpretation to the contrary was plainly erroneous and deference was not required, that substantial evidence did not support the BHA's decision, and that the BHA's legal conclusions were inconsistent with its factual findings.

Providers have the burden of proving that the Department's interpretation of Section 1187.91(1)(iv) was plainly erroneous, and deference was not required. *See* Section 41.153 of the Department's Regulations ("[T]he provider has the burden of proof to establish its case by a preponderance of the evidence and is required to make a prima facie case by the close of its case-in-chief." 55 Pa. Code § 41.153(a); "The party with the burden of proof has the burden of production[.]" 55 Pa. Code § 41.153(c)); *see also Forbes Metro. Health Sys. v. Dep't of Pub. Welfare*, 558 A.2d 159, 161 (Pa. Cmwlth. 1989) (Because "a presumption of validity attaches to state agency action[,] . . . the burden of proof rests on the party seeking to have the action reversed.").

Here, pursuant to Section 1187.91(1)(iv), prior to price setting and using the first quarter Index, the Department trends the audited costs reported in the NIS database "**forward to the 6th month (i.e., mid-point) of the 12-month period for which the prices are set**." 55 Pa. Code § 1187.91(1)(iv) (emphasis added). Although Section 1187.91(1)(iv) clearly reflects that the Department shall *conclude*

its calculation at the mid-point of the cost report year, it does not specify where the calculations are to *begin* (i.e., at the cost report mid-point, end point, or some other point).

The Department declares that the only language potentially guiding where the Department is to begin is *cost report information*. According to the Department, although its Regulations do not define *cost report information*,[22] because nursing facilities must report *total costs* in their cost reports, and *total costs* are not fully incurred or established until the end date of the cost year, its end point to mid-point methodology for indexing forward and inflating allowable costs is reasonable, accurate, and consistent with Chapter 1187 of the Department's Regulations. The Department contends that because Section 1187.91(1)(iv) does not specify the point *from which* it is to trend the audited costs, that provision is ambiguous, and the Department's interpretation thereof was entitled to *Auer* deference.

Providers agree that the Department's Regulations do not define *cost report information*, and that Section 1187.91(1)(iv) is silent as to the starting point for the Department's Inflation Factor adjustment. Nevertheless, Providers contend that their experts supplied uncontradicted, credited testimony that there is only one reasonable interpretation of Section 1187.91(1)(iv) - since inflation causes the nursing facilities' *costs* to differ from the beginning to the end of the cost report period and the year-end date does not account for that inflation, the mid-point of the cost reporting year should be the starting point from which inflation is measured or the adjustment factor is determined. Providers assert that because Section

---

[22] Section 1187.71 of the Department's Regulations sets forth the cost information nursing facilities must supply in their MA-11s, including: resident care and other resident-related costs; administrative costs; capital costs; labor and related party costs; costs of services, moveable property, and supplies; and supporting records. *See* 55 Pa. Code § 1187.71.

1187.91(1)(iv) is capable of only one reasonable interpretation, it is not ambiguous and, thus, this Court need not defer to the Department's interpretation.

Because Section 1187.91(1)(iv) is capable of more than one reasonable interpretation, it is ambiguous. *See Interstate Gas Supply*. Accordingly, the Department's interpretation thereof is subject to *Auer* deference. However, before proceeding to determine whether the Department's interpretation of Section 1187.91(1)(iv) is clearly erroneous or inconsistent, *see Auer*, we must address Providers' argument that the U.S. Supreme Court in *Kisor* modified *Auer*, such that the BHA had to conduct a *Kisor* analysis before concluding that the Department's interpretation of Section 1187.91(1)(iv) was entitled to deference.

In *Kisor*, the U.S. Supreme Court discussed the history of *Auer* deference and concluded that "a court should not afford *Auer* deference unless the regulation is *genuinely ambiguous*[,]" *Kisor*, 588 U.S. at 574 (emphasis added), meaning that, "before concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction." *Id*. (quoting *Chevron*, 467 U.S. at 843 n.9). The *Kisor* Court held that, only if genuine ambiguity remains after that consideration should courts proceed to determine if the agency's interpretation of the regulation is reasonable. *See id*. The *Kisor* Court remanded the matter to the U.S. Court of Appeals for the Federal Circuit to go beyond its original conclusion that neither parties' interpretation appeared unreasonable and "make a conscientious effort to determine, based on indicia like text, structure, history, and purpose, whether the regulation really has more than one reasonable meaning." *Id*. at 589-90.

Providers contend that *Kisor* applies because the Pennsylvania Supreme Court relied on it in the *Corman II* footnote. Although "th[e Pennsylvania Supreme] Court, like all state courts, is bound by decisions of the U.S. Supreme Court [only] with respect to the federal Constitution and federal substantive law[,]"

*Commonwealth v. Jemison*, 98 A.3d 1254, 1257 (Pa. 2014), Pennsylvania courts are "not bound by the [U.S.] Supreme Court on matters of administrative law[.]" *Harmon v. Unemployment Comp. Bd. of Rev.*, 207 A.3d 292, 311 n.4 (Pa. 2019) (Wecht, J., concurring). This Court acknowledges that

> [i]n matters of agency deference, [the Pennsylvania Supreme] Court historically has chosen (by volition rather than by command) to take its cues from federal law. *See Wirth v. Commonwealth*, . . . 95 A.3d 822, 841 n.18 ([Pa.] 2014); *Nw. Youth Servs.* . . . , 66 A.3d [at] 311 . . . ("Pennsylvania courts' treatment of deference to administrative agency rules has followed the [U.S.] Supreme Court's lead . . . .").

*Crown Castle*, 234 A.3d at 686-87 (Wecht, J., concurring); *see also Corman II.*

However, while perhaps persuasive, U.S. Supreme Court plurality opinions are not binding or precedential for Pennsylvania state courts. *See Texas v. Brown*, 460 U.S. 730, 737 (1983) (An opinion "never [] expressly adopted by a majority of th[e U.S. Supreme] Court . . . [is] not a binding precedent[.]"); *see also People v. Beasley*, 609 N.W.2d 581, 587 (Mich. App. 2000) ("A plurality opinion of the [U.S.] Supreme Court is not binding precedent."). To date, neither the Pennsylvania Supreme Court nor this Court have expressly adopted *Kisor's* genuinely ambiguous standard. In *Woodford v. Insurance Department*, 243 A.3d 60 (Pa. 2020), although the Pennsylvania Supreme Court had concluded that the subject regulation's plain text was unambiguous, Justice Donohue nevertheless extensively discussed *Kisor* in her concurrence. Similarly, in *Crown Castle*, although the Pennsylvania Supreme Court held that there was no regulatory ambiguity in that case for which deference was required, Justice Wecht authored a concurrence discussing *Kisor*. Thus, the Pennsylvania Supreme Court has not adopted *Kisor's genuinely ambiguous* standard. Moreover, although in *McHenry v. Goodyear Tire & Rubber Co.*, 305 A.3d 257 (Pa. Cmwlth. 2023), this Court, citing to *Kisor*, stated that "*Auer*

24

deference refers to courts' deference to agencies' reasonable readings of genuinely ambiguous regulations[,]" *McHenry*, 305 A.3d at 261 n.9 (citing to *Kisor*, *Auer*, and *Clearfield Cnty.*), because the *McHenry* Court was not called upon to construe an ambiguous regulation, reference to *Kisor's genuinely ambiguous* standard was dicta. Accordingly, this Court disagrees with Providers' conclusion that the *Corman II* Court's footnote reference to *Kisor* "replaces prior deference standards for agency interpretations of their own regulations[.]" Providers' Br. at 21.

Having concluded that *Auer* deference applies in this case, this Court next determines whether the Department's interpretation is clearly erroneous or inconsistent with Section 1187.91(1)(iv), *see Corman II*; *Clearfield Cnty.*, and whether it "reflect[s] [its] fair and considered judgment[,]" rather than a convenient litigating position or *post hoc* rationalization. *Auer*, 519 U.S. at 462.

As stated above, **Section 30(A) of the Act** requires that state plans include methods and procedures to assure that provider payments produce efficiency, economy, quality of care, and adequate access to providers by MA beneficiaries. *See* 42 U.S.C. § 1396a(a)(30)(A). Although that provision "mandates 'substantive compliance' with the four specified factors, [] it '**does not impose any particular method or process** for getting *to* that result.'" *Christ the King I*, 730 F.3d at 308 (bold emphasis added) (quoting *Rite Aid of Pa. v. Houstoun*, 171 F.3d 842, 851 (3d Cir. 1999)). "Section 30(A) leaves it 'up to a state how it will assure the [required] outcomes.'" *Id.* (additional quotation marks omitted). "[T]he state's 'process of decision-making' in setting a rate methodology must be 'reasonable and sound,' [*Houstoun*, 171 F.3d] at 853, and "budgetary considerations may not be the sole basis for a rate revision," *id*. at 856." *Christ the King I*, 730 F.3d at 308. Thus, "Section 30(A) allows states to set a rate methodology using any process that is reasonable, considers more than simply budgetary factors, and results in payments that are sufficient to meet recipients' needs." *Id.*

In Section 1187.101(a) of its Regulations, the Department declared that nursing facility services payments will be subject to: (1) MA Manual Chapters 1187 (relating to nursing facility services) and 1101 (relating to general provisions); (2) applicable state statutes; and (3) applicable federal statutes, federal regulations, and the Commonwealth's approved State Plan. *See* 55 Pa. Code § 1187.101(a); *see also* Section 1187.1(c) of the Department's Regulations, 55 Pa. Code § 1187.1(c). After properly promulgating the MA Manual - including Chapter 1187 - the Attorney General approved it for form and legality, and the Department included it in the State Plan, which CMS ultimately approved.

Section 1187.91(1)(iv) states: "Prior to price setting, **cost report information will be indexed forward to the 6th month of the 12-month period for which the prices are set**." 55 Pa. Code § 1187.91(1)(iv) (emphasis added). Since 1996, the Department has employed its end point to mid-point methodology on the basis that Section 1187.91(1)(iv) specifically references *cost report information*, which consists of the nursing facilities' *total costs*, *see* 55 Pa. Code § 1187.96, that are not fully incurred or established until the end of each reported cost year.

Section 1187.1(c) of the Department's Regulations provides: "The MA [p]rogram provides payment for nursing facility services provided to eligible recipients by enrolled nursing facilities. Payment for services is made subject to this chapter and Chapter 1101 (relating to general provisions)." 55 Pa. Code § 1187.1(c). Section 1187.51(d) of the Department's Regulations specifies that "[n]ursing facilities will receive payment for **allowable costs** in four general cost centers: (1) [r]esident care costs[;] (2) [o]ther resident related costs[;] (3) [a]dministrative costs[;] and (4) [c]apital costs." 55 Pa. Code § 1187.51(d) (emphasis added). To receive payment, nursing facilities must file **cost reports listing allowable costs for each 12-month fiscal year that ends either on June 30 or December 31**. *See* 55

26

Pa. Code § 1187.73. Importantly, inflation is not listed as an allowable cost in Chapter 1187 and, thus, is not *cost report information*. *See* Sections 1187.2 and 1187.51 of the Department's Regulations, 55 Pa. Code §§ 1187.2 (definitions), 1187.51.

After auditing the cost report information and placing the audited allowable costs in the NIS database, *see* 55 Pa. Code §§ 1187.52(a), 1187.77, 1187.91(1)(i), the Department uses that data to set rates by calculating "**total** resident care cost[,]" 55 Pa. Code § 1187.96(a)(1)(i) (emphasis added), the "**total** other resident[-]related cost[,]" 55 Pa. Code § 1187.96(b)(1)(i) (emphasis added), the "**total** allowable administrative cost[,]" 55 Pa. Code § 1187.96(c)(1)(ii) (emphasis added),[23] and capital costs based on "**total** actual resident days" and "**total** number of . . . allowable beds." 55 Pa. Code § 1187.96(d)(1)(i) (emphasis added). The Department reasonably interpreted that *total* data for a cost year can only be determined at the end of that year.

The fact that Providers' expert witnesses testified that the mid-point to mid-point methodology may be more reasonable and accurate does not render the Department's end point to mid-point methodology clearly erroneous.[24] *See Martin*

---

[23] Using each nursing facility's cost reports in the NIS database, the Department sets prices for the resident care costs, other resident-related costs, administrative costs, and capital cost categories pursuant to Section 1187.91 (relating to the NIS database) and Section 1187.96 (relating to price- and rate-setting computations) of the Department's Regulations. The Department calculates the three-year arithmetic mean to obtain resident care costs, other resident-related costs, and administrative costs. *See* 55 Pa. Code § 1187.96(a)-(c).

[24] The Department asserts that, by raising it for the first time on appeal, Providers waived their claim that the change in the Department's regulatory language from Chapter 1181 of the Department's Regulations (prior nursing facility reimbursement Regulations using a cost-based system) to Chapter 1187 (current nursing facility reimbursement Regulations using a case-mix system) reflected that Section 1187.51(b) of the Department's Regulations was intended to supplement both Subchapters E and G. *See* Department Br. at 23; Providers' Br. at 23-25. Section 41.32(d) of the Department's Regulations states: "A legal or factual objection or issue not raised in either a request for hearing filed within the time prescribed in subsection (a) or in an amended

27

*Media v. Dep't of Transp.*, 700 A.2d 563, 566 n.11 (Pa. Cmwlth. 1997) ("[T]he existence of evidence to support an interpretation contrary to that adopted by [the agency] is immaterial; the agency's interpretation of the regulation is controlling unless shown to be clearly erroneous."). Rather, the BHA could conclude that Ziegler's and LeBreton's uncontradicted testimony, although credible, merely reflected a difference of opinion, which the BHA and this Court observed in concluding that Section 1187.91(1)(iv) is subject to more than one reasonable interpretation.[25]

---

request for hearing filed under subsection (c) shall be deemed waived." 55 Pa. Code § 41.32(d). Section 41.181(f) of the Department's Regulations provides: "If a party files a post[-]hearing brief, a disputed issue or legal theory that is not argued in the party's post[-]hearing brief will be deemed waived." 55 Pa. Code § 41.181(f). Because Providers did not make this claim in their hearing request or amended hearing request, *see* R.R. at 61a-81a, 96a-109a, 132a-147a, nor their post-hearing brief, s*ee* R.R. at 202a-219a, 259a-284a, they waived it.

[25] The ALJ, and, by extension, the BHA, found Ziegler's and LeBreton's *opinions* uncontradicted and credible, *see* FOFs 30-31, but also concluded that "Laracuente . . . testified credibly . . . provid[ing] rebuttal evidence to support the Department's end[]point to mid-point methodology." FOF 32. As fact-finder, "the ALJ is free to accept or reject the testimony of any witness . . . in whole or in part, and determinations regarding credibility and weight of the evidence are within the province of the ALJ." *R.J.W. v. Dep't of Hum. Servs.*, 139 A.3d 270, 287 (Pa. Cmwlth. 2016) (quoting *DePaolo v. Dep't of Pub. Welfare*, 865 A.2d 299, 305 (Pa. Cmwlth. 2005)); *see also City of Phila., Bd. of Pensions & Ret. v. Clayton*, 987 A.2d 1255, 1262 (Pa. Cmwlth. 2009) ("It is beyond argument that the fact[-]finder is free to accept or reject the credibility of expert witnesses, and to believe all, part[,] or none of the evidence."). Further,

> "the fact-finder is free to believe all, part[,] or none of the evidence presented," even if uncontradicted, and that "[i]t is the job of the fact[-]finder to resolve conflicts in testimony." [*Commonwealth v.*] *Hoffman*, 938 A.2d [1157,] 1160 n.10 [(Pa. Cmwlth. 2007)]; *Allied Mech. & Elec., Inc. v. Pa. Prevailing Wage Appeals Bd.*, 923 A.2d 1220, 1228 (Pa. Cmwlth. 2007); *Bucks Cnty. Child[.] & Youth Soc. Servs. Agency v. Dep't of Pub. Welfare*, . . . 616 A.2d 170, 174 ([Pa.] 1992). "[T]he presence of conflicting evidence in the record does not mean that substantial evidence is lacking." *Allied Mech. & Elec., Inc.*, 923 A.2d at 1228.

Moreover, as the Department has proffered in response to Providers' claims that its methodology may result in nursing facilities losing six months of inflation, the MA Program is not required to cover provider costs. *See Mulberry Square Elder Care*. This Court has explained:

> "By opting for reimbursement from Medicaid, a provider purchases certainty; a guarantee of partial payment in lieu of possibly full payment or possibly no payment at all." *Evanston Hosp. v. Hauck*, 1 F.3d 540 (7th Cir. 1993). Should a provider wish "to preserve its right to seek its entire customary charge," the provider may choose not to participate in the MA Program. *Nickel v. Workers' Comp. Appeal Bd. (Agway Agronomy)*, 959 A.2d 498, 506 (Pa. Cmwlth. 2008).
>
> Federal law precludes participating providers from receiving payment above the amount paid by Medicaid. *Id*. "Service providers who participate in the Medicaid program are required to accept payment of the state-denoted Medicaid fee as payment in full . . . and may not attempt to recover any additional amounts elsewhere." *Id*. at 507 (emphasis added) (quoting *Rehab. Ass'n of Va., Inc. v. Kozlowski*, 42 F.3d 1444, 1447 (4th Cir. 1994) . . . ; *see also Lizer v. Eagle Air Med Corp.*, 308 F. Supp. 2d 1006, 1009 (D. Ariz. 2004) (federal regulations "preven[t] providers from billing any entity for the difference between their customary charge and the amount paid by Medicaid[]").

*Mulberry Square Elder Care*, 191 A.3d at 961. "'Section 30(A) . . . does not demand that payments be set at levels that are sufficient to cover provider costs,' but instead

---

*Fisler v. State Sys. of Higher Educ., Cal. Univ. of Pa.*, 78 A.3d 30, 44 (Pa. Cmwlth. 2013); *see also Grane Hospice Care, Inc. v. Dep't of Pub. Welfare*, 72 A.3d 322, 328 (Pa. Cmwlth. 2013) ("It is axiomatic that this Court may not disturb determinations of credibility and evidentiary weight on appeal."). "For purposes of appellate review, it is irrelevant whether there is evidence to support contrary findings; if substantial evidence supports the [fact-finder]'s necessary findings, those findings will not be disturbed on appeal." *Obimak Enter. v. Dep't of Health*, 200 A.3d 119, 126 (Pa. Cmwlth. 2018) (quoting *Verizon Pa. Inc. v. Workers' Comp. Appeal Bd. (Mills)*, 116 A.3d 1157, 1162 (Pa. Cmwlth. 2015)). Where, as here, substantial evidence supported the ALJ's factual findings and her findings of fact supported her legal conclusions, this Court will not disturb them.

requires that they be 'sufficient to meet recipients' needs.'" *Christ the King I*, 730 F.3d at 308 (quoting *Pa. Pharmacists Ass'n v. Houstoun*, 283 F.2d 531, 538 (3d Cir. 2002)).  Accordingly, Providers are not guaranteed that the Department's payments will cover all of their costs.

In addition, this Court acknowledges Providers' argument that the Department was required to look to Section 1187.51(b) of the Department's Regulations (relating to the scope of allowable costs and policies) to interpret Section 1187.91(1)(iv).[26]  Section 1187.51(b) of the Department's Regulations states:

> *The Medicare Provider Reimbursement Manual* (CMS Pub. 15-1) and the [f]ederal regulations in 42 [C.F.R.] Part 489 (relating to provider and supplier agreements) appropriate to the reimbursement for nursing facility services under the [MA P]rogram are a supplement to this chapter [(i.e., Chapter 1187)].  **If a cost is included** in this subchapter [(i.e., Chapter 1187, [S]ubchapter E (relating to allowable program costs and policies)] **as allowable, the CMS Pub. 15-1 and applicable [f]ederal regulations may be used as a source for more detailed information on that cost**.  The CMS Pub. 15-1 and applicable [f]ederal regulations **will not be used for a cost that is nonallowable** either by a statement to that effect in this [C]hapter [1187] or **because the cost is not addressed in this [C]hapter [1187] or in the MA-11**.  The CMS Pub. 15-1 or applicable [f]ederal regulations **will not be used to alter the treatment of a cost provided for** in this [S]ubchapter [E (relating to allowable program costs and policies)] or the MA-11.

55 Pa. Code § 1187.51(b) (emphasis added).  Thus, Section 1187.51(b) of the Department's Regulations reflects that the Department and providers *may rely on*

---

[26] Although Providers argued before the BHA that the Department's interpretation of Section 1187.91(1)(iv) was inconsistent with how the Department calculates disproportionate share incentive payments under Section 1187.111(c) of the Department's Regulations, they do not make that argument in this appeal.

CMS Pub. 15-1 and applicable federal regulations for more detailed information, but only as to *allowable costs*, and it *may not be used to alter treatment of allowable costs* listed in a cost report. It does not address or apply to rate setting methodology. Accordingly, the Department did not intend for Section 1187.51(b) of the Department's Regulations to apply in any way to supplement its Inflation Factor calculations.

> Further,
>
> [w]hen a court reviews a regulation issued pursuant to an agency's legislative rule-making power, the court may not substitute its own judgment for that of the agency. To demonstrate that the agency has exceeded its administrative authority, "it is not enough that the prescribed system of accounts shall appear to be unwise or burdensome or inferior to another. Error or lack of wisdom in exercising agency power is not equivalent to abuse. What has been ordered must appear to be so entirely at odds with fundamental principles as to be the expression of a whim rather than an exercise of judgment." *Hous. Auth. of C[nty.] of Chester v. Pa. State Civ[.] Ser[v]. Comm'n*, . . . 730 A.2d 935, 942 ([Pa.] 1999) (citing *Girard* [*Sch. Dist. v. Pettinger*], 392 A.2d [261,] 263 [(Pa. 1978)], citing in turn *AT&T v. United States*, 299 U.S. 232, 236-37 . . . (1936)).

*Tire Jockey*, 915 A.2d at 1186. Finally, "great latitude is given to the states in dispensing their [MA] funds and the reviewing court's role does not 'extend to rethinking the political and financial concerns behind a particular payment plan[.]'" *Forbes Metro. Health Sys.*, 558 A.2d at 161 (quoting *Miss. Hosp. Ass'n, Inc. v. Heckler*, 701 F.2d 511, 516 (5th Cir. 1983)). Accordingly, Providers did not meet their burden of proving that Section 1187.91(1)(iv) is subject only to their interpretation.

Based on this Court's review, the Department's end point to mid-point methodology "reflect[s] [its] fair and considered judgment[,]" rather than a

convenient litigating position or *post hoc* rationalization, *Auer*, 519 U.S. at 462, and it is not clearly erroneous or inconsistent with Section 1187.91(1)(iv), the Department's MA Regulations, the Act, the HHS's Regulations, or the State Plan. Accordingly, the Department's interpretation of Section 1187.91(1)(iv) is entitled to deference.

Providers also contend that the BHA's order violated due process by changing an evidentiary ruling made after the hearing without prior notice. Specifically, Providers argue that where the ALJ took one position on the record regarding Laracuente's testimony at the hearing and, later, *sua sponte* and without explanation, reversed that position, the BHA cannot be permitted to use such evidence to justify its decision. The Department retorts that it was harmless error.

At the hearing, on Providers' objection, the ALJ limited Laracuente's testimony about the comment the Department received to a proposed Regulation to her declaration that a comment was rejected. *See* R.R. at 372a-389a. The ALJ declared: "I'll give it the weight that it deserves, which is simply that[,] in general[,] the Department gets comments that they can accept or reject." R.R. at 388a. The ALJ later reiterated: "[W]e're going to just leave it at that, give it a little bit of weight, probably not much of anything and then we'll allow those . . . arguments for any further review if need be." R.R. at 389a.

However, in the Recommendation, as adopted by the BHA, relying on the stricken testimony and the Department's post-hearing brief, the ALJ stated: "In point of fact, [Providers] had the opportunity to comment on the [I]nflation [F]actor methodology, which has been used since the inception of the case-mix payment system; however, the comment was rejected." ALJ Recommendation at 36. Based on the ALJ's ruling at the hearing, that conclusion was not supported by the record evidence.

"Due process principles apply to administrative proceedings[.]" *R.J.W.
v. Dep't of Hum. Servs.*, 139 A.3d 270, 289 (Pa. Cmwlth. 2016).

> Fundamentally, due process affords a party notice and an
> opportunity to be heard. Due process principles require an
> opportunity, among other things, to hear evidence adduced
> by an opposing party, cross-examine witnesses, introduce
> evidence on one's own behalf, and present argument. The
> key factor in determining whether procedural due process
> is denied is whether the party asserting the denial of due
> process suffered demonstrable prejudice.

*Riccio v. Newtown Twp. Zoning Hearing Bd.*, 308 A.3d 928, 936-37 (Pa. Cmwlth.
2024) (citations omitted).

This Court agrees that Providers were not afforded the opportunity to
rebut evidence previously ruled inadmissible.

> [B]ecause the ALJ sustained [Providers'] . . . objection at
> the hearing, [they] had no reason to and, therefore, did not
> attempt to rebut that evidence. When the ALJ later
> reversed her ruling and relied upon the statements in
> rendering her recommendation which [the] BHA adopted,
> there was no forum in which [Providers] could offer
> rebuttal and, thus, [Providers'] due process rights were
> violated in that limited manner.

*Momma D's Day Care Ctr., LLC v. Dep't of Pub. Welfare* (Pa. Cmwlth. No. 2009
C.D. 2014, filed Sept. 23, 2015), slip op. at 13.[27]

Nevertheless, the ALJ informed the parties at the hearing that it would
afford Laracuente's testimony about the comment little weight because it was not
probative of the ultimate issue. In addition, even without considering the ALJ's
expansion of Laracuente's testimony, there were sufficient other record bases on
which the ALJ properly concluded that the Department's interpretation of Section

---

[27] Unreported decisions of this Court issued after January 15, 2008, may be cited as
persuasive authority pursuant to Section 414(a) of this Court's Internal Operating Procedures. 210
Pa. Code § 69.414(a).

1187.91(1)(iv) was entitled to deference. Accordingly, the ALJ's error was harmless.

Lastly, Providers assert that the BHA's order should be reversed and remanded for final computations of amounts due to Providers consistent with their agreements and without adjustments to the BAF.[28] However, the sole issue before this Court, as Providers acknowledged, was "whether the interpretation of the [I]nflation [F]actor from end[]point to mid[-]point is proper or whether it should be calculated mid[-]point to mid[-]point." R.R. at 402a. Moreover, the parties stipulated that if the Department's interpretation and application of Section 1187.91(1)(iv) is correct, then the Department properly calculated and applied the Inflation Factor. *See* Stipulations ¶ 40 (R.R. at 161a). Hence, the parties agreed that the Second Stipulation of Facts, in which Providers offered the calculations to be applied in the event they prevailed in the instant appeal, *see* R.R. at 163a-167a, was not ripe for consideration at the hearing. *See* R.R. at 400a-404a. Ultimately, in light of this Court's conclusion that the Department's interpretation and application of Section 1187.91(1)(iv) is entitled to deference, there is no basis on which to reverse and remand for recomputations of amounts owed to Providers.

## Conclusion

Based on the foregoing, the BHA's order is affirmed.

_____
ANNE E. COVEY, Judge

---

[28] The Department's argument that Providers waived this issue lacks merit where the parties stipulated to the amount of additional MA payments due them if they prevailed in this litigation. *See* R.R. at 163a-167a.

34

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lutheran Home at Kane and Siemon's : 
Lakeview Manor Estate, : 
    Petitioners : 
     : 
     : 
   v. : 
     : 
Department of Human Services, :   No. 303 C.D. 2023
    Respondent : 

## O R D E R

AND NOW, this 4th day of June, 2024, the Department of Human Services' Bureau of Hearings and Appeals' March 1, 2023 order is affirmed.

_____
ANNE E. COVEY, Judge